753 A.2d 1278

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Matthew KEMP, Appellant.**

Supreme Court of Pennsylvania.

Argued Feb. 1, 2000.

Decided June 22, 2000.

Reargument Denied Aug. 2, 2000.

158

George Henry Newman, Philadelphia, for Matthew Kemp.

Catherine Marshall, Philadelphia, for Commonwealth.

Robert A. Graci, Harrisburg, for Office of Attorney General.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

ZAPPALA, Justice.

This is a direct appeal[1] from the conviction and sentence of death by the Philadelphia County Common Pleas Court. On April 22, 1998, a jury convicted Appellant of first degree murder, robbery, carrying a firearm on a public street, possessing an instrument of crime, and criminal conspiracy. After a penalty hearing, the jury returned a sentence of death on April 24, 1998. We now affirm that conviction and sentence for the reasons that follow.

Although Appellant does not raise the issue, we must examine the sufficiency of the evidence presented against Appellant, as we are mandated to do in all cases where the penalty of death has been imposed. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982).

In doing so, this Court must determine whether the evidence was sufficient to establish that the fact finder could have reasonably determined that all of the elements of the offense were proved beyond a reasonable doubt. *Commonwealth v. Michael*, 544 Pa. 105, 674 A.2d 1044, 1047 (1996). We view all evidence and reasonable inferences drawn from that evidence in the light most favorable to the verdict winner, here, the Commonwealth. *Id., see also Commonwealth v. Mason*, 559 Pa. 500, 741 A.2d 708 (1999), *petition for cert. filed*, April 10, 2000 (No. 99–9067).

In order to sustain a conviction for first-degree murder, the Commonwealth must establish that a human being was unlawfully killed, that the defendant did the killing, that the killing was willful, deliberate, premeditated, and the defendant acted with the specific intent to kill. *See* 18 Pa.C.S. §§ 2501–2502(a); *see also Mason*, 741 A.2d at 711–12.

■■■ The specific intent to kill may be shown by the use of a deadly weapon on a vital part of the body. *See Commonwealth v. Butler*, 446 Pa. 374, 288 A.2d 800, 802 (1972).

1. All appeals in cases that involve the death penalty are reviewed directly by this Court. *See* 42 Pa.C.S. § 9711(h)(1).

Furthermore, any element of first-degree murder may be shown by circumstantial evidence alone. *See Commonwealth v. May,* 540 Pa. 237, 656 A.2d 1335, 1340 (1995).

■ Testimony shows that the victim died at the Hospital of the University of Pennsylvania in the morning hours of September 5, 1996. N.T. 4/20/98 at 12–15. The victim's father and uncle positively identified the victim as Gregory Fells. N.T. 4/21/98 at 9. Dr. Ian Hood, the deputy medical examiner for the City of Philadelphia, testified that his post mortem examination of the victim showed that the victim suffered four gunshot wounds. N.T. 4/20/98 at 160. At least one of the four wounds suffered by the victim was inflicted at close range. *Id.* That wound tore the victim's heart in two and was inescapably fatal. *Id.* at 166. The other wounds punctured other organs, including the victim's spine, a wound that by itself would have resulted in at least temporary paralysis. *Id.* at 164. While it was impossible to determine the order in which the wounds were received, the relatively close range of the shot that pierced the victim's heart indicated that it was probably fired either first or last. *Id.* at 165.

An admitted co-conspirator to this crime, Wilbert "Sweet Pea" Golden, cooperated with the District Attorney and offered testimony against Appellant pursuant to a plea agreement in which Golden pled guilty to third degree murder. The memorandum of the agreement between the Commonwealth and Golden was read to the jury. N.T. 4/20/98 at 53–60.

Golden testified that he knew both the victim and Appellant. He met Appellant while both were in jail three months prior to the killing. Appellant and Golden both sold drugs out of the same house near 56th Street and Chester Avenue in Philadelphia. They spent the day prior to the murder using cocaine and heroin with the victim and others at this house. Around midnight, the victim left the house; when he returned, the remaining occupants of the house expressed that he was no longer welcome there because he was relatively unknown to the occupants and because there were weapons and drugs in

the house. Later, the victim walked past the house alone, without saying a word to those congregated there. N.T. 4/20/98 at 72. Appellant asked Golden where Golden kept his weapon and after Golden replied, Appellant retrieved the weapon. *Id.* at 73. Appellant then left the house walking in the direction that the victim had gone shortly before. Approximately five minutes later, Golden heard a number of gunshots. Another ten minutes later Appellant reappeared, carrying the weapon in one hand and the distinctive "Gregg" necklace that the victim had been wearing, in the other hand. Golden then hid the weapon and the jewelry in the house. *Id.* at 74. Golden testified that a couple of days later he sold the gun and split the proceeds of that sale with Appellant. *Id.* at 76–77. The next day Golden and Appellant traded the "Gregg" necklace for approximately $100 worth of heroin, which they proceeded to use, sharing with some other acquaintances. *Id.* at 79. Golden also testified that he questioned Appellant about the events that transpired in the morning of September 5, 1996. Golden stated that "[Appellant] told me that the guy didn't want to give it to him, so he shot him." *Id.* at 80.

Other witnesses included Mynell Buie, Thomas Kennedy, David Anderson, and Edith Boozer. Buie testified that she was in a relationship with Appellant at the time of the killing, that Appellant had admitted to shooting someone on the morning after the killing, and that he left the Commonwealth approximately a week after the killing. N.T. 4/17/98 at 56–77. Kennedy testified that he had accompanied the victim to the house on Chester Avenue earlier in the evening. *Id.* at 15. He testified that the victim was wearing a gold chain with a pendant that said "Gregg" on it on that night. *Id.* at 18. He also testified to Appellant's erratic behavior immediately following the shooting. *Id.* at 22. Anderson testified that Appellant also told him that he had not wanted to kill the victim, but did so because the victim was trying to run during the robbery attempt. *Id.* at 116. Anderson also described Appellant's sale of the handgun used in the killing. *Id.* at 118. Boozer testified that Appellant passed her on the street,

immediately before she heard a number of gun shots, and then Appellant passed her again returning from the direction in which she had just heard the shots. N.T. 4/16/98 at 83–106

Based upon this evidence presented at trial and the reasonable inferences drawn from this evidence, we hold that the evidence was sufficient to sustain a verdict of first degree murder.

Petitioner alleges several instances of prosecutorial misconduct, which he argues merit a new trial. A prosecutor is generally allowed to vigorously present and argue his case, as long as the comments are supported by evidence and contain inferences which are reasonably derived from that evidence. *See Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 231 (1995); *citing Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101, 1109 (1988). It is well-settled law that attorneys' statements or questions at trial are not evidence. *See Commonwealth v. Green*, 525 Pa. 424, 581 A.2d 544, 562 (1990). The focus of this Court's consideration of claims regarding prosecutorial misconduct is to determine whether the defendant was deprived of a fair trial and not whether the defendant was deprived of a perfect trial. *LaCava*, 666 A.2d at 231, *citing Commonwealth v. Holloway*, 524 Pa. 342, 572 A.2d 687 (1990). Thus, prosecutorial remarks constitute reversible error only where the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. *LaCava*, 666 A.2d at 231, *citing Holloway*, 572 A.2d at 693.

Initially, we note that prior to closing arguments the trial court instructed the jury that arguments are not evidence, that the jurors must resolve discrepancies, and that during deliberations, they must draw their own inferences guided by their own recollections. N.T. 4/21/98 at 68. The court also issued a curative instruction which stated that the jury was not to consider evidence of Appellant's drug use and evidence of Appellant's prior incarcerations as proof that Appellant

committed the charged crimes. N.T. 4/17/98 at 73. The court explained that the purpose of that evidence was merely contextual. *Id.*

■ We first discuss Appellant's allegations of prosecutorial misconduct during the guilt phase. The prosecutor's closing statement contained references to Appellant's drug usage, drug transactions, and Appellant's association with other persons who purchased, sold, or abused illegal drugs. Appellant argues that this was irrelevant and improper, citing to our decisions in *LaCava* and *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991). We do not believe that the present case is analogous to the highly prejudicial prosecutorial statements made in *LaCava* and *Chambers.*

In *LaCava*, this Court affirmed the appellant's conviction, but vacated the sentence of death because the prosecutor used his closing argument of the guilt phase to

> turn the jury's sentencing of appellant into a plebiscite on drugs and drug dealers and their destructive effect on society. The prosecutor attempted to expand the jury's focus from the punishment of appellant on the basis of one aggravating circumstance ... to punishment of appellant on the basis of society's victimization at the hands of drug dealers. The essence of the prosecutor's argument was to convince the jury to sentence appellant to death as a form of retribution for the ills inflicted on society by those who sell drugs.

666 A.2d at 237. Likewise in *Chambers*, we vacated a sentence of death because the prosecutor exceeded the limits of oratorical flair by referencing the Bible. We held there that "reliance in any manner upon the Bible or any other religious writing in support of the imposition of a penalty of death is reversible error *per se.*..." 599 A.2d at 644.

Appellant asks us to apply *LaCava* and *Chambers* to the closing statement of the guilt phase of his trial. We find these cases are not on point because the prosecutorial remarks regarding drugs in the present case were relevant either to rebut Appellant's counsel's assertions that the Common-

wealth's witnesses were not credible due to their drug use, or to complete the picture of the crime in its entirety, including the alleged motive for the underlying robbery and murder.

■ Appellant argues that the prosecutor committed reversible error by urging the jury to convict him on the basis of his association with other criminals. Particularly objectionable to Appellant is the following statement:

He says persons out there, Kennedy and Sweet Pea and Boozer, Anderson, he says that they were all thieves, drug addicts, criminals, and I think he may have even called them robbers. That's what [Appellant's counsel] said. Well, you know the thing they say about ducks, if it quacks like a duck and it walks like one and looks like one, it's probably one.

The person who we know from the evidence in this case who hung out with all these people on a daily basis was [Appellant]. Thieves, drug addicts, criminals and robbers. These were the people that he hung out with every day. What does that say about him?

N.T. at 4/21/98 at 91–92.

Later in closing arguments the prosecutor argued:

Based on the evidence, drug user, drug seller, robber threateninger, [sic] he is what he did. Let's don't blame 56th and Chester for him and his cohorts. There are obviously a lot of decent people living out at 56th and Chester. You see this action going on, but they can't get out of there, so they have the Eugene Andersons and the Wilbert Goldens and the Matthew Kemps sitting around, walking around with their guns on, selling drugs and using drugs, being outlaws on the corner at night.

Id. at 119–120. This statement was made in the context of summation which included the prosecutor reminding the jury that the victim was shot dead in the middle of a public street, during an assault and robbery, for the sole purpose of obtaining jewelry which could be converted into drugs, drugs which the entire group shared.

These statements were a direct rebuttal of Appellant's counsel's argument that those Commonwealth witnesses were

not believable because of their drug use. First, they recalled that the people testifying against Appellant were some of his closest associates. Second they underscored the prosecutor's argument that the robbery and murder were committed with the purpose of obtaining funding for the group's drug habit.

Next, Appellant argues that the prosecutor committed misconduct in his closing argument by stating that witness Boozer "spent her life shooting heroin ... waiting for her next fix from somewhere, probably at 56[th] and Chester, buying drugs from Matt Kemp and those others who were selling it outside of 5543 Chester Avenue." N.T. 4/21/97 at 92. Again, this statement, in context, was made to rebut the closing of Appellant's counsel, who argued that many of the Commonwealth's witnesses were not credible because of their drug addictions and their use of drugs on the night in issue. N.T. at 4/21/98 77–78. It also explained why this witness was sitting on the street in the early morning hours and why her testimony was unfocused.

Other prosecutorial statements complained of serve the same purpose:

> We do get the people who do hang out there which is what they have, Edith Boozer, Thomas Kennedy, Eugene Anderson, Wilbert Golden, drug users and criminals, and that's their cohort over there, the defendant. He's one of them.

N.T. 4/21/98 at 99.

> Don't blame 56[th] and Chester for the likes of Kemp and Golden and Anderson. The neighborhood didn't make them bad, they made the neighborhood bad, but the decent law abiding people who are in their houses at 4 o'clock in the morning while the streets are being ruled by the outlaws.

*Id.* at 120–121. These were simply attempts by the prosecutor to refute the allegations that the various witnesses to the crime could not be believed because of their drug usage.

Appellant argues that the prosecutor asserted a personal belief in Appellant's guilt when he stated:

There is no one on this planet who shot Gregory Fels other than this defendant. This is no big mystery. In fact its [sic] as plain as day.

\* \* \*

Find this defendant [guilty of] murder in the first degree, robbery, which he committed, criminal conspiracy, he conspired with Wilbert Golden to rob the victim, possession of the instrument of crime, violation of the Uniform Firearms Act of carrying this on the public streets of Philadelphia. Find him guilty based on the evidence. Use the common sense.

I tell jurors, look in your mind's eye. Look in your mind's eye and you will see on Thursday morning, September the 5th of 1996 at about 4:20 in the morning, thereabouts, 4:15, you will see [Appellant] robbing and killing the deceased Gregory Fell, and that's what he's charged with. Find him guilty of those crimes. Find him guilty for what he did. It's his turn to answer.

*Id.* at 122–26.

With these statements, the prosecutor was merely asking the jury to find Appellant guilty. We can find no error in a prosecutor asking a jury to render a verdict favorable to his position. The prosecutor here did not imply that he had special knowledge or an innate ability to determine guilt based upon his position as a prosecutor.

■ Appellant's final assertion of prosecutorial misconduct during the guilt phase closing arguments is that the prosecutor "testified" outside of the evidence presented when he discussed the ramifications of Golden's plea agreement. The prosecutor stated that he would be present at Golden's sentencing and that he would insure that Golden received a stiff punishment. This argument was also a response to Appellant's counsel's closing arguments. Appellant argued that Golden's testimony was tainted and incredible because he had been party to a plea agreement in which he agreed to testify for the Commonwealth in exchange for the opportunity to

plead guilty to third degree murder. Golden's veracity and credibility were an issue and we do not find that the prosecutor committed error by reminding the jury that Golden had not yet been sentenced for his admitted participation in this crime. We find that none of Appellant's allegations of error in the prosecutor's closing argument of the guilt phase amount to reversible error.

Appellant argues that the prosecutor committed misconduct by eliciting testimony regarding Appellant's involvement in drugs. A prosecutor does not commit misconduct by presenting relevant and admissible evidence. As a general rule, evidence of crimes distinct from the charges being tried is inadmissible if the sole purpose of such evidence is to demonstrate the defendant's bad character and propensity to commit criminal acts. *Commonwealth v. Mayhue*, 536 Pa. 271, 639 A.2d 421, 434 (1994). The same evidence may be admissible in other circumstances, however. To be admissible, the evidence must have some purpose other than simply prejudicing the defendant. Some examples of legitimate evidentiary purposes for the introduction of evidence of other crimes or criminal behavior include: motive, intent, absence of mistake or accident, a common scheme, to establish the identity of the person charged with the commission of the other crime, to impeach the credibility of a defendant's testimony, situations where a defendant used his prior criminal history to threaten or intimidate the victim, or situations where the distinct crimes were part of a chain or sequence or events which formed the history of the case and were part of its natural development. *Id.* at 434. After examining the testimony which Appellant complains of, we find that each instance falls within at least one of these categorically admissible purposes.

Edith Boozer volunteered testimony regarding Appellant's drug sales. This testimony was clearly not responsive to questions being asked by the prosecutor. Further, each time Appellant objected to Boozer's testimony, the objection was sustained. As it is apparent that the prosecutor did not

elicit the objectionable testimony, we cannot find that he committed misconduct. Additionally, because the court sustained the objections to the testimony, we do not believe that Appellant has demonstrated that he was prejudiced by Boozer's outbursts.

After Mynell Buie testified that Appellant had used drugs during the course of their relationship, Appellant objected. Buie also testified that Appellant had previously been "on State Road." [2] Appellant asked the trial court for a mistrial on the grounds of prosecutorial misconduct. At sidebar, this request was denied and the court offered a curative instruction instead. Appellant's trial counsel requested that the instruction be given at the end of the trial, rather than immediately, so that further attention would not be drawn to the objectionable testimony. At the end of the trial, the following instruction was issued:

> The other two points I should make is you have heard evidence regarding drugs, and the fact that at some point in time [Appellant] was incarcerated or in jail, this information was introduced simply to explain to you in the context of certain events and do[sic] not constitute evidence of [Appellant's] guilt in this case. You must not hold evidence of this—that the Commonwealth has proved beyond a reasonable doubt or that he is guilty of the charge simply because of the topic of drugs or simply because of the topic was introduced that he was in jail at some point in time.

N.T. 4/22/98 at 47. Appellant does not argue that the trial court abused its discretion in refusing to grant a mistrial, nor does Appellant argue that the curative instruction was insufficient to remedy any prejudice which may have been suffered by Appellant due to the testimony.

▮▮▮▮ Petitioner also argues that the prosecutor committed misconduct by eliciting testimony from Golden regarding Appellant's previous jail time. Appellant failed to object to any of Golden's testimony on this basis, therefore this issue

2. Appellant notes in his argument that "State Road" is the location of Philadelphia County's four prisons and their satellite facilities.

would normally be waived for purposes of appellate review. However, due to the final and irrevocable nature of the death penalty, we apply a limited relaxation of the waiver rules. *See Zettlemoyer*, 454 A.2d at 955 n. 19; *but cf. Commonwealth v. O'Donnell*, 559 Pa. 320, 740 A.2d 198 (1999)(holding that the relaxed waiver doctrine was not meant to serve as "an invitation to appellate counsel to appear before this Court carte blanche and expect that we will resolve a litany of newly developed challenges not raised or objected to before the lower court."), *and also Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998)(holding that we will no longer apply the relaxed waiver doctrine in appeals arising under the Post Conviction Relief Act). We therefore address this issue on its merits and find that the curative instruction given by the court was a sufficient response to avoid prejudice, in this instance. Appellant repeatedly refers to testimony that he believes to be improper, but raises these claims as prosecutorial misconduct. We cannot agree that this allegedly objectionable testimony was elicited with a purpose or in a manner which would cause us to conclude that the prosecutor had exceeded the bounds of acceptable conduct.

 Appellant argues that the following exchange was prosecutorial misconduct:

Q. [Prosecutor] When did you next hear from [Appellant] or see him?

A. [Buie] Well, I heard from him like two or three days later. He got there. He would call me like every night on the phone or whatever, or I would call him. We would just talk, but I didn't see him for like a month, a more or two [sic]. I didn't see him or hear from him, and then one day he called my house and he asked me to buy some jeans and a sweat shirt and I just said okay, but I never got the jeans and sweat shirt when I came back. He said he was going to blow my grandmother's house up.

N.T. 4/17/1998 at 65.

Appellant immediately objected and the objection was sustained. The court stated "Well, if it's part of the conversation.

He's not on trial for any of those threats so I'm telling the jury just disregard that." *Id.* at 65. It is apparent from a review of this exchange that Buie's answer was not responsive to the prosecutor's question. Furthermore, since the court instructed the jury to disregard the witness's statement, we do not believe that Appellant was prejudiced by this limited exchange.

Appellant further asserts that the aggregate of the above-alleged instances of misconduct created an inflammatory and manifestly unfair trial. He compares his trial to *Commonwealth v. Hoskins*, 485 Pa. 542, 403 A.2d 521 (1979), where we found that repeated reference to the defendant's religion and inflammatory questions regarding drug trafficking created an "atmosphere of the trial" where the " 'unavoidable effect' of the improper and inflammatory leading question . . . was to form in the minds of the jury bias and hostility toward Hoskins and thus prevent an objective verdict." *Id.* at 527. Since we do not find misconduct in any instance, we do not find that misconduct could exist in the aggregate.

The jury found the existence of two statutory aggravating factors: the defendant committed a killing while in the perpetration of a felony,[3] and the defendant has a significant history of felony convictions involving the use or threat of violence to the person.[4] We must examine the evidence presented in support of the aggravating factors in order to determine whether that evidence fails to support the finding of at least one of the aggravating circumstances. *See Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 737 (1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999); *see also* 42 Pa.C.S. § 9711(h)(3)(ii). We must also determine whether the sentence of death was the product of passion, prejudice or any other arbitrary factor. 42 Pa.C.S. § 9711(h)(3)(i). The facts of this case, as stated previously, indicate that this murder was committed during a robbery, which is a felony.[5] During

3. 42 Pa.C.S. § 9711(d)(6).

4. 42 Pa.C.S. § 9711(d)(9).

5. 18 Pa.C.S. § 3701 states:

the penalty phase of the trial, the Commonwealth also presented evidence of Appellant's previous convictions for violent felonies including another robbery, attempted murder, and rape. N.T. 4/23/98 at 14–23. We therefore find that the evidence was sufficient to support the jury's finding that at least one aggravating circumstance existed. We also find no indication that the sentence was the product of passion, prejudice, or any other arbitrary factor.

Appellant presented evidence under the "catch all" mitigating circumstance.[6] Appellant presented family members, including his mother and children, who testified that Appellant's absence would adversely affect the development of his children. The jury found the existence of this mitigating circumstance, but found that the aggravating circumstances outweighed the mitigating circumstances.

 Appellant complains that he was unfairly prejudiced by the prosecutor when the prosecutor labeled him as "sick," "sordid," "callous," "demented," and "inhuman," and characterized Appellant as having an "outlaw existence." We do not believe that the prosecutor exceeded the allowable scope of a penalty phase closing argument. Appellant was convicted of deliberately murdering another man during the course of a robbery motivated by the desire to obtain funds to purchase illegal drugs. Appellant had also been previously convicted of robbery and rape. In this case, we find that the phrases listed above were mere oratorical flair summarizing evidence and inferences reasonably deduced from the evidence presented.

 In addition to alleging prosecutorial misconduct, Appellant also argues that his trial counsel provided him with

(1) A person is guilty of robbery if, in the course of committing a theft, he:
(i) inflicts serious bodily injury upon another;

\* \* \*

(2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

6. 42 Pa.C.S. § 9711(e)(8) (Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.).

ineffective or constitutionally deficient assistance of counsel. It is presumed that absent a showing to the contrary, counsel was effective. *See Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981). For Appellant to show that his counsel was ineffective, he must show that the underlying claim is of arguable merit, that counsel's performance was unreasonable in light of the underlying claim, and that he suffered actual prejudice from counsel's deficient performance. *See Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

Appellant's first allegation is that trial counsel was ineffective for failing to object to the instructions given by the court to the jury at the conclusion of the penalty phase. Appellant asserts that the jury was given written instructions in violation of our holding in *Commonwealth v. Karaffa*, 551 Pa. 173, 709 A.2d 887 (1998). A review of the record, including the transcript of the proceedings as well as the other documents that form the record, indicates that the jury was given a verdict form while still in the jury box. The court then requested that the jury read the form while sitting in the box. When the jury completed reading the verdict form, the court verbally instructed the jury as follows:

I'm now going to give you a booklet. In the booklet there are instructions on how to fill out the sheet that you will take out with you, and the reason I'm doing it now is to make sure that everybody reads it, so read it and when you're done reading, look up. When I see everybody looking up, I'll give you the final couple of paragraphs. (Pause).

\* \* \*

I ask that the verdict slip that you take with you that is similar to the pages that were in your booklet that you just read, do not fill it out until after you finished discussing the case. We will give you written instructions on how to fill it out, which are exactly what you've already read, so that you will have a chance to read them again.

N.T. 4/23/98 at 91–92.

Appellant argues that the "booklet" and "instructions" mentioned in the transcript were supplemental to the verdict form.

No such supplemental instructions exist in the record, and Appellant has not offered any evidence of their existence other than the above-cited text of the transcript. We also note that the verdict form used by the court was titled "FIRST DE-GREE MURDER SENTENCING VERDICT SLIP." Immediately below that was the sub-title "GENERAL INSTRUCTIONS." This sub-heading only informed the jury as to the actual time and manner in which the verdict form itself was to be completed. This form gave no instructions regarding legal issues, or the manner in which the jury would conduct its deliberations. Thus, we have no basis for doubting the lower court's opinion which stated, "no such 'written instructions' [on the elements of a crime] were submitted to the jury, only a verdict slip listing aggravating and mitigating circumstances." Slip. op. at 9. This Court has allowed printed verdict forms and understands the use of such forms to be standard practice in this situation. Since we do not find that written instructions were given to the jury, we cannot find trial counsel ineffective for failing to object.

Appellant also argues that counsel was ineffective for failing to object to the court's instruction, based upon *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Again we find that the underlying claim, that there was a violation of the mandate of *Mills*, is without merit and therefore counsel cannot be deemed ineffective for failing to object. In *Mills*, the United States Supreme Court found that jurors must be free to consider any mitigating evidence regardless of whether the jury unanimously agrees on the mitigating evidence. The jury must be clearly instructed on this point. In the present case, despite Appellant's claims that the court did not instruct the jury to weigh the mitigating circumstances against the aggravating circumstances in a qualitative instead of quantitative manner, we note that the transcript shows the court gave the following instruction:

In deciding whether aggravating outweigh mitigating circumstances, do not simply count their number. Compare

the seriousness and importance of the aggravating with the mitigating circumstances.

N.T. 4/23/98 at 92. The court further instructed,

you are to regard a[sic] aggravating circumstance as being present only if you all agree that it is present. On the other hand, each of you is free to regard a particular mitigating circumstance as present despite what the other jurors may believe. This different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust sentences. It gives the defendant a full benefit of any mitigating circumstances.

*Id.* at 93.

We find that these instructions fulfill the mandate of *Mills*, and therefore, counsel was not ineffective for failing to raise an objection.

█ Finally, Appellant claims that counsel was ineffective for "agreeing that Appellant was an outlaw." During closing arguments of the penalty phase, counsel asked the jury to give Appellant the sentence of life imprisonment for the benefit of Appellant's young children. He presented Appellant as a man who had multiple "existences," a repeatedly convicted criminal who was also a caring father. Counsel suggested to the jury that by sentencing Appellant to life in prison, they would be removing him from the elements that led to his criminal conduct, while allowing him to continue, at least in a limited role, as a father. At the time of counsel's summation, Appellant already was convicted of first degree murder by the same jury that counsel was addressing. The Commonwealth presented conclusive and undisputed evidence of Appellant's other violent convictions, including rape and robbery. We find no error in counsel's use of the phrase "outlaw existence" under these circumstances. For the forgoing reasons, we affirm the verdict of first degree murder and the sentence of death.

The Prothonotary is directed to transmit to the Governor a full and complete record of the trial, sentencing hearing, imposition of sentence, opinion and order of this court in accordance with 42 Pa.C.S. § 9711(i).