**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Larkeem BROASTER, Appellant.**

Superior Court of Pennsylvania.

Submitted July 26, 2004.

Filed Dec. 3, 2004.

---

Brian J. McMonagle, Philadelphia, for appellant.

Hugh J. Burns, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before: STEVENS, BOWES, and POPOVICH, JJ.

STEVENS, J.

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County, after a jury convicted Appellant of third degree murder and possession of an instrument of crime. Specifically, Appellant alleges prosecutorial misconduct, an erroneous evidentiary ruling, and an improper jury instruction. We affirm.

¶ 2 The trial court opinion aptly summarizes the relevant facts and procedural history, as follows:

> The victim Kenneth Kemp was killed when the defendant Larkeem Broaster fired several gunshots into his vehicle near the 3000 block of Cumberland Street in North Philadelphia. The murder went unsolved for three months until an eyewitness, Orlando O'Neal, identified Larkeem Broaster as the killer.[1]
>
> On May 31, 2001 at approximately 2 p.m. Mr. O'Neal observed the victim standing at the corner of 28th and Cumberland Street in North Philadelphia arguing with the defendant Larkeem Broaster. [O'Neal] heard the victim telling [Broaster] that the drugs [Broaster] sold to him were of poor quality and demanded a refund of $1,000.00 for the purchase. After a brief argument, Mr. O'Neal observed the victim lift up his shirt, brandishing a handgun that was tucked in his waistband. [Broaster] walked away and the victim got into his 1999 silver Nissan Maxima and drove off.
>
> Later during the day, at approximately 6 p.m. Mr. O'Neal observed the victim driving south on Dauphin Street and [Broaster] following a few cars behind in

---

1. It was established at trial that Orlando O'Neal regularly purchased cocaine from street dealers supplied by Appellant, and he knew Appellant from the neighborhood for about twelve or thirteen years. N.T. 3/28/03, 69–73. O'Neal volunteered his eyewitness account to authorities approximately ten months after the murder, when he had been arrested for third-degree felony robbery, his fifth theft-based arrest. O'Neal, however, denied under intense cross-examination that he offered the information in exchange for a reduced sentence. The Commonwealth also asserted that it never promised O'Neal a reduced sentence, and it further established that O'Neal entered an open guilty plea to the robbery charge and received a three to twenty-three month prison sentence, which fell within the three to fourteen months, plus or minus three months, standard guideline range sentence for the offense. *See Commonwealth v. Boyer*, 856 A.2d 149, 153 (Pa.Super.2004) (recognizing that sentencing guidelines provide for minimum and not maximum sentences).

a station wagon. [Broaster] got out of the driver's side of the station wagon and started shooting a .45 caliber semi-automatic gun[2] at the victim and chasing [the victim's car] down the street. One of the bullets hit the victim in the back of his head, who fell unconscious, lost control of his car and crashed into a car parked on Dauphin Street. [The victim] died the next day from a bullet wound to his head.

Three months after the murder, Philadelphia police had contact with [Broaster] during a police chase during which he threw a .45 caliber semi-automatic gun out of his vehicle.[3] Ballistics tests determined that the gun recovered was not the murder weapon.

Trial Court Opinion filed 11/24/03, at 1–3.

¶ 3 Though ballistics tests ruled out the discarded .45 semi-automatic handgun as the murder weapon, the tests also revealed that this gun had been loaded in the same signature style as had the .45 semi-automatic used to kill Kenneth Kemp. Specifically, both guns had been loaded with three bullets manufactured from the Federal Company, and three bullets from various other makers. The Commonwealth used this forensic evidence and the incriminating eyewitness account of Mr. O'Neal supplied months later to charge Appellant with, *inter alia,* the murder of Kenneth Kemp. Appellant was tried before a jury, which convicted Appellant of third degree murder and possession of an instrument of crime. On May 13, 2003, Appellant was sentenced to a concurrent term of ten to twenty years' imprisonment. This appeal followed.

1. WHETHER THE TRIAL COURT ERRED IN PERMITTING THE COMMONWEALTH TO INTRODUCE EVIDENCE THAT THE APPELLANT WAS IN POSSESSION OF A FIREARM THREE MONTHS AFTER THE HOMICIDE WHICH WAS NOT THE MURDER WEAPON?

2. WHETHER THE PROSECUTER ENGAGED IN A PATTERN OF PORECUTORIAL MISCONDUCT BY COMPLETELY MISCHARACTERIZING THE TESTIMONY OF DAMON ANTHONY?

3. WHETHER THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY ON WITH THE COMPLETE VOLUNTARY MANSLAUGHTER CHARGE SO AS TO INCLUDE THE "MISTAKEN BELIEF" PRONG OF THE STATUTE?

Brief of Appellant at 2.

¶ 4 The Appellant's first claim is that the trial court improperly admitted Appellant's discarded .45 caliber handgun into evidence. The Commonwealth conceded at trial that the discarded gun was not the murder weapon. It used the gun, instead, to demonstrate Appellant's access to and preference for the same type weapon, loaded with the same particular signature combination of bullets, as used in Kenneth Kemp's murder. The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its

2. The police subsequently recovered the fired cartridge cases for six .45 caliber bullets from the scene, all of which came from the same .45 caliber semi-automatic pistol.

3. On March 5, 2001, an arrest warrant was issued against Appellant for an unrelated matter which preceded the murder at issue. On August 21, 2001, before Appellant even became a suspect in the murder investigation, he was arrested on the initial arrest warrant.

discretion. *Commonwealth v. Reid,* 571 Pa. 1, 44, 811 A.2d 530, 550 (2002).

■ ¶5 According to Pa.R.E. 401, " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

> Relevant evidence may nevertheless be excluded 'if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' [4]

> Because all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. As this Court has noted, a trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which [a] defendant is charged.

*Commonwealth v. Serge,* 837 A.2d 1255, 1260–61 (Pa.Super.2003).

¶6 In addressing the admissibility of a gun for demonstrative purposes, the Pennsylvania Supreme Court has held that:

> [a] weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime.

*Commonwealth v. Williams,* 537 Pa. 1, 16, 640 A.2d 1251 (1994). Similarly, in *Commonwealth v. Shoatz,* 469 Pa. 545, 366 A.2d 1216 (1976), the Pennsylvania Supreme Court stated that:

> [A]t the time of his arrest approximately one and one-half years after the incident, appellant along with his companions were found to have possessed numerous advanced military weapons and munitions. These items included two of the United States Army's most advanced automatic rifles or machine guns, the M–16, plastic explosives manufactured solely for military use and other various military-type of ammunition. It is now contended that this evidence was irrelevant and served only to inflame and prejudice the jury since appellant was not being tried for the possession of this property.

> * * *

> Inasmuch as the instruments and devices found on appellant consisted of guns, ammunition and explosives, all of which corresponded generically and some of which corresponded exactly to the type of ammunition used in the homicide, it was relevant as a circumstance to help identify appellant and to help to connect him with the crime of which he was accused . . .

*Shoatz,* 366 A.2d 1216, 1225–26.

■ ¶7 Likewise, in the present case, the discarded gun was relevant to identify the Appellant and connect him with the crime at issue. Specifically, the gun tended to prove that (1) Appellant readily obtained handguns of the same caliber used in the murder, (2) readily discarded handguns, (3) preferred to load his gun with the same number of bullets used on the victim,

---

4. See Pa.R.E. 403; *Commonwealth v. Kitchen,* 730 A.2d 513 (Pa.Super.1999).

and (4) preferred the same distinctive combination of bullets fired at the victim.

¶ 8 Furthermore, no unfair prejudice emanated from the admission of this evidence. The prosecutor took appropriate steps to inform the jury that the gun admitted into evidence was not the murder weapon.

> Now, just so it's clear, there were ballistics tests done on the .45 caliber to see whether or not it was the same .45 caliber that was used to kill Mr. Kemp and it was not. It was a different gun but it was of the same caliber and of the same type; namely, a .45 caliber semi-automatic pistol...I submit to you that evidence will show a number of things. One that Mr. Broaster had access to this type of weapon, knowledge and familiarity with these guns, specifically .45 caliber, .45 automatics, and I submit to you a preference for a particular type of gun, the same exact type caliber used to commit the murder on [sic] Kenneth Kemp, a .45 caliber pistol.

N.T. 3/26/03 at 44.

¶ 9 In addition, the court's charge to the jury explained the limited use to which the jury could put Appellant's possession of the discarded weapon:

> Generally speaking, evidence regarding the defendant's possible involvement in another unrelated crime is not admissible to prove that the defendant is a person of bad character or he has a propensity to engage in criminal activity and would therefore have been more likely to have committed this crime and this evidence may be considered by you for any such purpose; however, such evidence is admissible if it is being offered for some other legitimate reason such as to assist the jury in determining other trial issues. This evidence is being admitted in this trial for this limited purpose only. And it is to be considered by the jury for this limited purpose. You may consider the evidence regarding the defendant's alleged possession— alleged possible possession of a .45 caliber semi-automatic to assist you in determining the defendant's possible state of mind, knowledge, awareness and intent at the time of this incident as well as whether or not the defendant acted with malice in this case.

> You may also consider this piece of circumstantial evidence which may show that the defendant had access to and knowledge of and familiarity with particular types of guns; namely .45 caliber semi-automatic, which may show that the defendant had both the means and the ability to commit this killing and therefore, may be probative of the defendant's identity as the person who committed the crime. You may not, however, consider this as evidence tending to show that the defendant may be a person of bad character or have criminal propensities and he would therefore have been more likely to have committed this crime.

N.T. 4/2/2003, 139–141. We therefore find the trial court did not run afoul of Rule of Evidence 401 and 403 by admitting the evidence in question, and we accordingly reject Appellant's claim to the contrary.

¶ 10 Appellant next claims prosecutorial misconduct occurred during closing arguments, when the prosecutor allegedly mischaracterized the testimony of defense witness Damon Anthony, the victim's best friend who was also fired upon at the murder scene. When Damon Anthony testified on direct examination that the Appellant was not the murderer, the prosecutor theorized that Anthony refused to identify Appellant as the murderer only because Anthony knew all too well that "street ethics" call for retaliation against a "snitch":

So then the question becomes this. 'Would Damon Anthony intentionally refuse to identify [the Appellant] as the killer of his best friend and come into court and go one further and say it wasn't him? Would he do that?' And the answer to that question, folks, is absolutely. For a lot of reasons. Damon Anthony, you saw him, is very much from the streets. He's all about that and the street ethic which is you don't snitch and the street ethic which is look out for number one, me. And it might be sad to say this but Kenny Kemp is here and gone. He's dead. He can't do anything for Damon Anthony and he can't do anything to Damon Anthony. [The Appellant] is very much alive. He can certainly do things to him and he can certainly do things for him. N.T. 4/2/03 at 111. However, Appellant failed to object to these particular remarks, and so his claim based on such remarks is waived. Pa. R.A.P. 302(a) (issues not raised in the lower court are waived and cannot be raised for the first time on appeal).

¶ 11 Appellant did preserve his second claim that prosecutorial remarks caused him undue prejudice. Specifically, the prosecutor sought to discredit Anthony's testimony that upon seeing Appellant in prison he knew that authorities had arrested the wrong man for the victim's murder, by arguing to the jury that Appellant was not even in prison at the time of this purported sighting.

¶ 12 During trial, Anthony testified as follows:

Q. How is it that you met [Appellant] inside that prison, were you a prisoner there?

A. Yeah.

Q. And he was awaiting trial in this case?

A. Yeah, I guess.

Q. And how is it that you came to meet him?

A. Well, he was on the same block as somebody else that I knew and he confided in them, you know, what he was arrested for and who he was arrested for and the guy told him that I was the guy that was in the car so you know, they set it up whereas though we could talk and he told me that he was the guy that got arrested for it and I couldn't believe it because I'm looking at him right now and I know that's not the guy.

N.T. 4/1/03 at 68–69.

¶ 13 The prosecutor sought to discredit Anthony's account with the following closing argument:

But the biggest lie of all Damon Anthony told you was the lie about seeing Larkeem Broaster up at the prison because he heard at the prison that the guy that supposedly killed Kenny was there and he wanted to see him. Well, folks, if Kenny Kemp's killed May 31, 2001 Larkeem Broaster—I'm sorry, Romel Damon Anthony is taken into custody November of 2001, six months later, that's when he's in jail. But when is Larkeem Broaster…officially accused, notified, put on notice, arrested and charged with is murder? Remember the stipulation? May of 2002. Damon Anthony is in jail in November of 2001. Larkeem Broaster isn't even a suspect in this case until March of 2002 when Orlando O'Neal comes forward for the first time, and he's not officially charged until May of 2002. But Romel Damon Anthony tells you that while he was up in jail he heard that the man the police were saying committed this murder was there and he wanted to see the guy and

they brought him Larkeem and he said it's not the at guy.

Wrong. Because Larkeem Broaster didn't become the guy until May of 2002, not in November of 2001. He wasn't even a fly on the radar screen in November.

N.T. 4/2/03 at 109–111 (Prosecutor's Closing Argument).

¶ 14 Defense counsel objected to the statement after the closing argument, but was overruled at sidebar:

MR. SIEGEL [defense attorney]: Your Honor, two requests. Number one, there was a reference made during the closing of Mr. Gilson to the fact that, quote, [the Appellant] was in jail when Damon was arrested in November 2001. There is no evidence presented in this case to that effect.

THE COURT: I thought he said [the Appellant] was not in jail.

MR. GILSON [prosecutor]: I said he was. Damon testified that when he was arrested he went up to jail and saw [the Appellant].

MR. SIEGEL: He testified he saw him in jail at some point while he was there, not in November of 2001, but at some point [the Appellant] was there and he saw him. However, stating that he was there when Damon was arrested in November of 2001, which is what was stated, is absolutely incorrect. There is nothing in the record to support that.

MR. GILSON: The reasonable inference is that the defendant was taken in August when the police recovered the .45 caliber, he was transported to headquarters and he was in fact photographed. That evidence, coupled with Damon Anthony's testimony, would permit a reasonable inference to be drawn that the defendant was in custody when Anthony was picked up by the police in November of 2001.

THE COURT: I'll allow it. I agree with that.

N.T. 4/2/03 at 124–125.

¶ 15 Our review of the record shows that the prosecutor misapprehended Anthony's statement, for Anthony did not suggest that he had seen Appellant in prison at a time prior to when Appellant had been arrested for the murder at issue. In fact, elsewhere in Anthony's testimony, he stated that he had first met Appellant "sometime in 2003 at CFCF [Curran–Fromhold Correctional Facility]." N.T. 4/01/03 at 68. Nevertheless, the prosecutor's mistake did not amount to prosecutorial misconduct warranting a new trial.

The focus of this Court's consideration of claims regarding prosecutorial misconduct is to determine whether the defendant was deprived of a fair trial and not whether the defendant was deprived of a perfect trial. Thus, prosecutorial remarks constitute reversible error only where the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Carter*, 855 A.2d 885, 890 (Pa.Super.2004) (quoting *Commonwealth v. Kemp*, 562 Pa. 154, 753 A.2d 1278 (2000)).

¶ 16 The prosecutor's commentary about Damon Anthony's testimony did not deprive Appellant a fair trial. Regardless of the prosecutor's confused recollection, the jury still heard Anthony, the victim's best friend, testify at trial with Appellant confronting him that Appellant was not the man who murdered Kenneth Kemp. N.T. 4/1/03 at 64. The prosecutor's theory about the prison encounter, therefore was of little value where Anthony provided a

live exculpatory identification of Appellant before the jury.

¶ 17 Moreover, Anthony was clear as to when he said he saw Appellant in prison, making it all the less likely that the prosecutor's mistake persuaded the jury toward a guilty verdict. Indeed, we have no reason but to presume, as we do under the accepted standard of review, that the jury, pursuant to the court's instructions, understood that counsel's arguments were not evidence and that the jury's recollection of the evidence controlled. *See Commonwealth v. Passarelli*, 789 A.2d 708, 713 (Pa.Super.2001) (juries are presumed to follow a trial court's instruction). What the jury evidently relied upon, therefore, was the totality of incriminating forensic evidence and eyewitness testimony admitted at trial. Accordingly, Appellant's prosecutorial misconduct claim fails.

▮ ¶ 18 Appellant's third and final claim is that the trial court erred by failing to instruct the jury on the complete voluntary manslaughter charge so as to include the "mistaken belief", otherwise known as the "imperfect self-defense", prong of the offense. Following the Commonwealth's closing argument, the following sidebar discussion took place:

> MR. SIEGEL [Defense Counsel]: Given the closing of the prosecutor, I would ask the Court to also charge on voluntary manslaughter.
>
> THE COURT: What charge?
>
> MR. SIEGEL: Voluntary Manslaughter.
>
> THE COURT: That is was like heat of passion type of thing.
>
> MR. SIEGEL: He was being shot at.
>
> MR. GILSON [Prosecutor]: Which prong, Counsel, heat of passion or mistaken belief in right to use self-defense?
>
> MR. SIEGEL: Both.

> MR. GILSON: I would submit the argument, with all due respect, I have no objection to a heat of passion voluntary manslaughter. I would object to a mistaken belief for self-defense because under the law, once the defendant chases...
>
> THE COURT: I don't think you get that because of the chase as well. He's following him down the street. But I'll give—I'll give voluntary heat of passion.

N.T. 4/02/03 at 124–126. Appellant assigns error with this ruling.

¶ 19 "18 Pa.C.S. § 2503(b), Voluntary manslaughter," provides:

> (b) UNREASONABLE BELIEF KILLING JUSTIFIABLE—A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable.

18 Pa.C.S. § 2503(b). This imperfect self-defense provision has been explained by our courts:

> This self-defense claim is imperfect in only one respect an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must [still be met in order to establish] unreasonable belief voluntary manslaughter.
>
> In order to establish the defense of self-defense under 18 Pa.C.S. § 505, the defendant must not only show that he was protecting himself against the use of unlawful force but must also show that he was free from fault in provoking or continuing the difficulty which resulted in the killing.

*Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 947 (2001). *See also, Common-*

*wealth v. Tilley,* 528 Pa. 125, 595 A.2d 575, 582 (holding that in order to establish the defense of self-defense, it must be shown that (a) the slayer was free from fault in provoking or continuing the difficulty which resulted in the slaying; (b) that the slayer must have reasonable believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use such force to save himself therefrom; and (c) the slayer did not violate any duty to retreat or to avoid the danger).

¶ 20 Here, witness testimony indicated that the events leading up to the murder transpired over four hours, and that Appellant's car was following the victim's car when Appellant exited his vehicle, ran up to the driver's side window of the victim's car, and shot the victim. Even were we to consider the argument not raised herein by Appellant, that ballistic evidence corroborates Damon Anthony's testimony that he had, several blocks earlier, fired the first shots at the car pursuing them, Appellant still had the obligation under the imperfect self-defense theory to show that he had not continued the difficulty which resulted in the killing. Only by ending his pursuit of the victim's car could Appellant have made this showing, but Appellant failed in this duty to retreat.

¶ 21 The Commonwealth's prosecutorial theory against Appellant, therefore, did not entitle Appellant to an imperfect self-defense instruction, for the only facts adduced at trial supported the charge that Appellant continued the difficulty that resulted in the victim's murder. Therefore, Appellant's final claim is meritless.

¶ 22 Judgment of Sentence affirmed.