J-S79037-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| RAHEEM BROWN, | : | |
| | : | |
| Appellant | : | No. 2963 EDA 2015 |

Appeal from the Judgment of Sentence May 15, 2015
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s): CP-51-CR-0010356-2013

BEFORE: GANTMAN, P.J., MOULTON and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED DECEMBER 28, 2016**

Raheem Brown ("Brown") appeals from the judgment of sentence imposed following his convictions of second-degree murder, conspiracy, robbery, burglary, and violation of the Uniform Firearms Act.[1] We affirm the convictions, vacate the separate judgment of sentence for robbery, and affirm the judgment of sentence in all other respects.

In its Opinion, the trial court set forth a detailed recitation of the factual and procedural history of this case, which we adopt for the purpose of this appeal. *See* Trial Court Opinion, 12/30/15, at 2-20.

On appeal, Brown raises the following issues for our review:

1. Was the evidence presented to the jury sufficient to sustain convictions against [Brown] for second-degree murder and conspiracy[,] where the evidence showed that [] co-defendant[, ]Emmanuel Duran[ ("Duran"),] killed the

---

[1] *See* 18 Pa.C.S.A. §§ 2502(b), 903(c), 3701(a)(1)(i), 3502(c)(1), 6106(a)(1).

decedent spontaneously and independently of [Brown] and the crimes of robbery and burglary?

2. Were the second-degree murder and conspiracy verdicts of guilty against the weight of the evidence[,] where the testimony of various Commonwealth witnesses was weak, inconclusive, unreliable, incredible and inconsistent?

3. Did the trial court err[] in denying [Brown's] Motion to Suppress an unduly suggestive photographic identification procedure[,] where only a single photograph of [Brown] was used to make the identification?

4. Did the trial court err[] in denying [Brown's] Motion to Sever the trial from [] Duran['s trial,] where the evidence presented against Duran was substantial[,] and demonstrated that he killed the decedent spontaneously and independently of [Brown,] and the crimes of robbery and burglary?

Brief for Appellant at 4-5 (some capitalization omitted, issues renumbered for ease of disposition).

In his first issue, Brown contends that the evidence was insufficient to convict him of second-degree murder and conspiracy. *Id*. at 19. Brown asserts that he, Duran and Edward Brooks ("Brooks") allegedly planned a robbery and burglary of the decedent for drugs and money, and that murder was never part of the plan. *Id*. Brown claims his testimony that, after no drugs or money were found, he told the others that it was "time to leave" constitutes evidence that he did not conspire to murder the decedent. *Id*. at 19-20. Brown argues that he was merely present at the scene when the unplanned murder spontaneously and independently occurred. *Id*. at 20.

In its Opinion, the trial court addressed Brown's first issue, set forth the relevant law, and determined that the evidence was sufficient to support

his convictions of second-degree murder and conspiracy. *See* Trial Court Opinion, 12/30/15, at 38-41, 42-43. Based on our review, we agree with the reasoning of the trial court, which is amply supported by the record, and affirm on this basis as to Brown's first issue. *See id*.

In his second issue, Brown contends that his convictions of second-degree murder and conspiracy were against the weight of the evidence. Brief for Appellant at 20. Brown asserts that the only witness to identify him as participating in the robbery/burglary was Brooks, who cooperated with the Commonwealth, secured a prison sentence of 16 to 32 years, and had a motive to lie. *Id*. at 20-21. Brown claims that Brooks lied to his mother about the events leading up to the murder, and claimed that he did not know that Brown and Duran were armed or that they planned to rob the decedent and burglarize his home. *Id*. at 21. Brown argues that the other witnesses who testified for the Commonwealth recanted their statements during trial, including John Bowie ("Bowie"), Joshua Hines ("Hines"), and Abu Adul Wakeel. *Id*. Finally, Brown contends that Bowie confessed to the murder during his trial testimony. *Id*.

In its Opinion, the trial court addressed Brown's second issue, set forth the relevant law, and determined that Brown's convictions of second-degree murder and conspiracy were not against the weight of the evidence. *See* Trial Court Opinion, 12/30/15, at 46-48. Based on our review, we discern

no abuse of discretion by the trial court, and affirm on this basis as to Brown's second issue. *See id*.

In his third issue, Brown contends that the trial court erred by denying his Motion to Suppress identification evidence. Brief for Appellant at 22. Brown asserts that, while questioned by police, Hines and Bowie identified Brown through a single photograph.[2] *Id*. at 23. Brown concedes that he may have been in the presence of Bowie and Hines prior to the incident, but argues that no testimony was presented to establish the frequency of their interactions with Brown or the length of time that they knew Brown. *Id*. Brown contends that "[t]hese brief encounters with [Brown] necessitated the use of a traditional eight photograph[] array in order to insure a proper identification[,]" and that "the single photograph identification procedure [used] was improperly suggestive." *Id*. at 23-24.

> Our standard of review of a denial of suppression is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may

---

[2] On appeal, Brown also challenges Brooks's identification of Brown. *See* Brief for Appellant at 23. However, as Brown failed to raise a claim regarding Brooks's identification in his Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal, he failed to preserve this issue for our review. *See Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) (holding that, if an appellant is directed to file a concise statement of matters to be raised on appeal pursuant to Pa.R.A.P. 1925(b), any issues not raised in that statement are waived).

reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Galendez*, 27 A.3d 1042*,* 1045 (Pa. Super. 2011) (*en banc*) (citation omitted).

In its Opinion, the trial court addressed Brown's third issue, set forth the relevant law, and determined that it properly denied Brown's suppression Motion. *See* Trial Court Opinion, 12/30/15, at 23-25. Based on our review, we agree with the reasoning of the trial court, and affirm on this basis as to Brown's third issue. *See id*.

In his final issue, Brown contends that the trial court erred by denying his Motion to Sever his trial from Duran's trial. Brief for Appellant at 21. However, Brown failed to raise this issue in his Concise Statement. Therefore, he failed to preserve this issue for our review. *See Lord*, *supra*.

Nevertheless, our review of the certified record discloses that the sentencing court sentenced Brown to life imprisonment for his second-degree murder conviction as well as a concurrent prison term of 10 to 20 years for his underlying felony (robbery) conviction. Although Brown has not challenged this aspect of his sentence, this Court may raise and review an illegal sentencing issue *sua sponte*. *See Commonwealth v. Oree*, 911 A.2d 169, 172 (Pa. Super. 2006). Pursuant to the Pennsylvania Supreme Court's decision in *Commonwealth v. Tarver*, 426 A.2d 569 (Pa. 1981), a sentencing court has no authority to impose a sentence for a felony murder conviction, as well as a sentence for the predicate felony conviction.

Accordingly, the sentencing court erred by imposing a prison sentence for Brown's robbery conviction. *See Commonwealth v. Garnett*, 485 A.2d 821, 829 (Pa. Super. 1984) (explaining that the trial court erred by imposing a prison term of 20 to 40 years on convictions for burglary, arson, and related offenses, in addition to concurrent terms of life imprisonment imposed for convictions on two counts of second-degree murder, where the burglary and arson convictions were the predicate felonies).

Here, the sentencing court lacked the authority to impose a separate sentence for the robbery conviction, where the robbery constituted the predicate offense for Brown's felony murder conviction. Accordingly, we affirm the convictions, vacate the separate judgment of sentence for robbery, and affirm the judgment of sentence in all other respects.

Judgment of sentence affirmed in part and vacated in part.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/28/2016</u>

- 6 -

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH                    :           CP-51-CR-0010356-2013

                                :           **FILED**

vs.                                         DEC 3 0 2015

                                :           Criminal Appeals Unit
                                            First Judicial District of PA
                                :           SUPERIOR COURT
RAHEEM BROWN                     :           2963 EDA 2015


BRINKLEY, J.                                DECEMBER 30, 2015

**OPINION**

Defendant Raheem Brown appeared before this Court for a jury trial and was found

guilty of second-degree murder, conspiracy, robbery, burglary and violation of the Uniform

Firearms Act (VUFA) 6106. This Court sentenced Defendant to a mandatory sentence of life

without the possibility of parole on the second-degree murder charge, 20 to 40 years state

incarceration on the conspiracy charge, 10 to 20 years state incarceration on the robbery charge,

10 to 20 years state incarceration on the burglary charge, and 3½ to 7 years state incarceration on

the VUFA 6106 charge. The sentences on all charges were to run concurrently with one another.

Defendant appealed the judgment of sentence to the Superior Court and raises the following

issues on appeal: (1) Whether the Court erred when it denied Defendant's motion to dismiss the

information based on delay; (2) Whether the Court erred when it denied Defendant's motion to

suppress identification; (3) Whether the Court erred when it denied Defendant's motion to

exclude prior bad acts evidence and granted the Commonwealth's motion to admit prior bad acts

1

evidence; (4) Whether the Court erred when it limited Defendant's cross-examination of a witness on the potential prison sentence he was facing; (5) Whether the Court erred when it instructed the jury that the prior statements of certain witnesses could be considered as substantive evidence; (6) Whether the Court erred in giving a flight instruction; (7) Whether the evidence was sufficient to find Defendant guilty of all charges; (8) Whether the verdict was against the weight of the evidence.

## PROCEDURAL HISTORY

On June 11, 2013, Defendant was arrested and charged with murder, conspiracy, burglary, robbery and VUFA 6106. From May 5 to May 15, 2015, Defendant and co-defendant Emmanuel Duran ("Duran") were tried together in the presence of a jury. On May 15, 2015, Defendant was found guilty on all charges. On that same day, this Court sentenced him to a mandatory sentence of life without the possibility of parole on the second-degree murder charge, 20 to 40 years state incarceration on the conspiracy charge, 10 to 20 years state incarceration on the robbery charge, 10 to 20 years state incarceration on the burglary charge, and 3½ to 7 years state incarceration on the VUFA 6106 charge. The sentences on all charges were to run concurrently with one another. On May 22, 2015, Defendant filed a post-sentence motion for reconsideration, which was denied by operation of law on September 30, 2015. On October 1, 2015, Defendant filed a Notice of Appeal with the Superior Court. On October 8, 2015, after receiving all the notes of testimony, this Court ordered Defendant to file a Concise Statement of Errors pursuant to Pa.R.A.P. 1925(b), and Defendant did so on October 29, 2015.

## FACTS

Trial began in this matter on May 5, 2015. Defendant was represented at trial by Michael Huff, Esquire, while the attorney for the Commonwealth was Jack O'Neill, Esquire. The

2

Commonwealth called Wuyatta Fahnbulleh ("Fahnbulleh") as its first witness. Fahnbulleh testified that she was with the decedent, Rush Thompson ("Thompson"), in his house on Trinity Street on November 8, 2009 and that she had been friends with him for roughly six months by that point. Fahnbulleh testified that, on that day, she was braiding a friend's hair when Thompson approached her at approximately 5:00 p.m. and told her that he wanted to spend the evening with her. Fahnbulleh further testified that she told Thompson that she would come over after she finished braiding her friend's hair and that she ultimately arrived at Thompson's house a little before 7:00 p.m. Fahnbulleh stated that Thompson's two sons were not home at the time and that they were alone in his house. Fahnbulleh testified that she and Thompson smoked crack cocaine together and had sexual intercourse. Fahnbulleh further testified that they were interrupted by the door bell, which Thompson went downstairs to answer. (N.T. 5/5/2015 p. 85-93).

Fahnbulleh testified that, roughly ten minutes after Thompson left to answer the door, she heard the television and radio suddenly become very loud and she screamed Thompson's name. Fahnbulleh further testified that, after she screamed, two males, one of whom was light-skinned while the other was dark-skinned and holding a gun, walked up the stairs towards her. Fahnbulleh stated that the light-skinned male told her to put on her clothes and to cover her eyes so she would not look at them. Fahnbulleh testified that, after she dressed, the light-skinned male took her downstairs and pushed her against the wall. Fahnbulleh further testified that she could hear Thompson pleading for his life and that he said to one of the males, "you're my cousin, we're family, don't do this to me." Fahnbulleh testified that the males continually asked Thompson where he kept his drugs and money and Thompson told them there were no drugs in his house. Id. at 93-94.

3

Fahnbulleh testified that one of the males sent another to search the house while they dragged her onto the floor beside Thompson and that she could hear them beat and choke him. Fahnbulleh testified that she believed there were three males present in Thompson's house, because when the two males brought her downstairs she could hear another male in the living room giving them instructions. Fahnbulleh stated that she never saw the third male, but only heard him, and that one of the men was wearing a pair of brown Timberland boots. Fahnbulleh testified that they asked her where the drugs were located but she told them she did not know. Fahnbulleh stated that she heard one of the males say, "let's go, there's nothing in this house," to which another of the males replied, "I'm not leaving without anything." Fahnbulleh testified that she then heard a "pow" sound and everything was quiet thereafter. Id. at 94-99.

Fahnbulleh testified that, when she next opened her eyes, she saw Thompson taking his last breath with blood coming from his head. Fahnbulleh further testified that she ran from the house and knocked on their neighbor's door but no one answered. Fahnbulleh testified that she ran towards another house and, when the occupants answered, she screamed, "they just shot [Thompson], they just shot [Thompson]". Fahnbulleh further testified that the inhabitants asked her whether she wanted them to call 911 and she told them to do so. Fahnbulleh further stated that she went to the house of a pastor she knew and, after she calmed down, she went to the police station. Fahnbulleh stated that the police took her to the Homicide Unit, where she gave a statement on November 9 at 6:23 p.m. Id. at 99-103.

Fahnbulleh testified that she gave a second statement to the police on March 13, 2010, at which time she was shown a photo array. Fahnbulleh further testified that she recognized the darker-skinned male who came upstairs with a gun and she circled his photograph. Fahnbulleh stated that the gun was a black semiautomatic gun with a barrel that was seven to eight inches in

4

length. Fahnbulleh testified that she smoked crack cocaine earlier in the day before meeting with Thompson, but her use of crack cocaine did not impair her ability to remember the event or perceive what was happening. Fahnbulleh testified that she described the lighter-skinned male to police as "a black male, my complexion, my weight...between 5'6" to 5'9". He had strong cheek bones, probably between 27 to 30 years old...he had a black hat, something white on it. He had brown Timberlands...He had black jeans and a yellow sweater, colorful, like the one you knit, like homemade. Also [he] look[ed] like a baby face." Id. at 103-14.

The Commonwealth called Edward Brooks ("Brooks") as its next witness. Brooks testified that he was currently in prison after pleading guilty to Thompson's murder. Brooks further testified that he knew Thompson through his mother and that he used to live directly adjacent to Thompson's house at 1825 South 68th Street. Brooks stated that he used to go over to Thompson's house to play video games with him and that he bought marijuana on a daily basis from Thompson. Brooks testified that, on November 8, 2009, he went over to Thompson's house at about 1:00 p.m. to buy marijuana and that he went back that same day at around 7:00 p.m. with Defendant and Duran to rob Thompson. Brooks stated that he had earlier discussed robbing Thompson with Defendant because he knew that Thompson sold drugs from his house and assumed he would have money. Brooks further stated that this conversation took place at Defendant's house, which was across the street from his house, and that Duran was not present for the conversation. Brooks testified that Duran arrived at Defendant's house a few minutes after the conversation ended and about ten minutes before they went to Thompson's house. (N.T. 5/6/2015 p. 11-19).

Brooks testified that he did not have a gun on him but Defendant had a .45-caliber black semiautomatic gun while Duran carried a .38-caliber revolver. Brooks further testified that he

5

knocked on Thompson's door and that Thompson let the three of them into his house after Brooks asked to buy drugs. Brooks stated that, shortly after they entered Thompson's house, Defendant and Duran drew their guns on Thompson. Brooks testified that Duran told Thompson to lay down on the floor while Defendant went upstairs and he searched the living room for drugs. Brooks further stated that Defendant returned from upstairs with a woman and told her to stay in the corner. Brooks testified that he was at the bottom of the steps when the woman was brought down and that he grabbed her arm to place her in the corner. Brooks further testified that Duran was on top of Thompson and told him to bring the woman to the dining room, which he did. Id. at 19-26.

Brooks testified that, while he and Defendant continued to search the house, Duran hit Thompson on the head with his gun and asked him "Where is it at?" Brooks further testified that Thompson told them that it was in the basement but, when he went to the basement to check, there was a pit-bull there so he returned to the living room and kicked Thompson in the head. Brooks further testified that he and Duran choked Thompson for a few seconds. Brooks stated that Thompson was not wearing a t-shirt and that the jeans he had been wearing had fallen down to his ankles. Brooks further stated that he and Duran were both dressed entirely in black but he did not remember what Defendant was wearing. Id. at 26-33.

Brooks testified that, after he finished searching the house, Defendant came downstairs and told them they should leave. Brooks further testified that he replied they could not leave Thompson alive because Thompson knew him and he was afraid that Thompson would kill him in retaliation if they left him alive. Brooks stated that Defendant told him that he would have to be the one to kill Thompson and he replied that he was unable to do so because he had never killed anyone. Brooks further testified that, as he and Defendant argued, Duran shot Thompson

6

once in the head using the .38-caliber revolver. Brooks stated that Duran was crouched over Thompson when he shot him and that Thompson was motionless after he was shot. Brooks further stated that the three of them ran out of Thompson's house immediately afterwards. Brooks testified that he never touched a gun at any point during the robbery and that he never told his mother that he had. Brooks further testified that neither he nor Duran went upstairs and he was unsure why the woman said that he did and that he had a gun. Id. at 33-38, 53-55.

The Commonwealth called Officer David Gerard ("Gerard") as its next witness. Gerard testified that he had worked in the 12th District for approximately 8 years and that he responded to a radio call in the area of Trinity Street at around 7:00 p.m. on November 8, 2009. Gerard further testified that the radio call stated that somebody had been shot inside a home and that, although the exact address was unknown, the front door to the house was left open. Gerard stated that he arrived at the location and observed that the front door of 6726 Trinity Street was open. Gerard further stated that he approached the property from the front steps while his partner proceeded to the rear of the property. Gerard testified that, immediately after entering the front door, he observed Thompson lying face down on the living room floor. Gerard further testified that Thompson's pants were down around his ankles and that, while he was not wearing a shirt, he had a white t-shirt covering his head which was partially soaked in blood. Gerard stated that, after he checked Thompson for vital signs, he searched the property but did not locate any other people inside the house. Gerard further stated that the medics arrived at the scene and together they rolled Thompson over and pulled him further into the living room. Gerard testified that, as they moved Thompson, he saw the projectile part of a bullet in a pool of blood where Thompson's head had been laying. Gerard further testified that he searched the area for a fired cartridge casing but was unable to find any. Id. at 161-65.

7

The Commonwealth called Michelle Thomas ("Thomas") as its next witness. Thomas testified that she had been friends with Thompson and that Brooks was her son. Thomas further testified that, sometime after she learned that Thompson had been killed, the police came to her house for Brooks. Thomas stated that Brooks was in New York on a church retreat at the time so she called her brother to retrieve him and, when he returned to Philadelphia, he turned himself in to police. Thomas further testified that she asked Brooks why Homicide detectives were looking for him and, although he initially denied involvement, he eventually told her that he was involved in Thompson's murder. Thomas testified that Brooks told her that he went with two other men to Thompson's home and told Thompson that they wished to buy marijuana from him. Brooks further told her that, after Thompson let them into his home, the two men pulled out guns and robbed him. Brooks told her that one of the men gave a gun to him and told him that he had to kill Thompson, but he was unable to do it. Brooks further told her that when he gave the gun back to the man, the other man shot Thompson in the head and they ran out of the house. Thomas testified that Brooks told her that one of the other men was Defendant, who lived across the street from them, but she did not know who the second man was. Id. at 172-80.

The Commonwealth called Myron Baker ("Baker") as its next witness. Baker testified that, at around 8 a.m. on November 9, 2009, three males came to his house. Baker further testified that the first male was 5'6", around 18 to 26 years old, light-skinned and had a tattoo on his lower arm, while the other two males were both approximately 5'8" to 5'10", around the same age as the first male and that one of the other males had a medium complexion while the other had a dark complexion. Baker testified that he was the lawful owner of two .40-caliber firearms and that, when the males came to his house, he had one of the firearms, a .40-caliber Glock 27, in his waistband while the other one, a .40-caliber black and silver HK, was in his

8

truck. Baker testified that the light-skinned male had a black .38-caliber revolver with a two to three inch barrel length while the other two males each had semiautomatic handguns. Baker further testified that the light-skinned male was wearing a black hooded sweatshirt and blue jeans while the other two wore dark hooded-sweatshirts and jeans. Baker stated that the males took his handguns from him and left. Id. at 206-14.

The Commonwealth called Officer Joseph Rapone ("Rapone") as its next witness. Rapone testified that he had been assigned to the Philadelphia Highway Patrol for 18 years and that, on June 9, 2010, he made a car stop in the 2800 block of North 5th Street. Rapone stated that, after stopping the vehicle for a violation, he was approaching the vehicle on foot when his partner yelled "gun". Rapone further stated that he observed the passenger in the left rear passenger seat, Joshua Hines ("Hines"), put a handgun in his pocket. Rapone testified that he immediately drew his firearm, took the gun from Hines then arrested him and placed him in the police car. Rapone further testified that Defendant was sitting in the right rear passenger seat of the vehicle and that he took Defendant out of the vehicle. Rapone stated that, as he searched Defendant for weapons, his partner again yelled "gun" as he was searching the right front passenger, John Bowie ("Bowie"). Rapone testified that he let go of Defendant, who subsequently fled southbound on 5th Street and westbound on Somerset before they lost him. Rapone testified that he recovered a .40-caliber Glock from Bowie and a .38-caliber Lady Smith revolver with a very small barrel from Hines. Rapone further testified that the revolver had four live rounds and one fired cartridge casing when it was recovered. Rapone stated that Defendant was not apprehended that day and he did not recover any drugs from the car. Id. at 228-37.

The Commonwealth called Bowie as its next witness. Bowie testified that he was arrested on June 9, 2010 after the car in which he was travelling with Defendant and Hines was

9

pulled over by the police. Bowie further testified that he had a Glock 27 semiautomatic handgun on him when he was arrested and that Hines had a .38-caliber Smith and Wesson revolver on him. Bowie stated that he did not remember Defendant or Duran admitting to him that they had committed a murder and that he told the police that they had so he could leave custody. Bowie further stated that Defendant and Duran could not have committed the murder because he, in fact, killed Thompson, although he did not even know Thompson's name. Bowie testified that Thompson was the only person in the house when he killed him and that he used the .38-caliber Smith and Wesson. Bowie further testified that he killed Thompson with the assistance of another male, although he did not know the male's name. Bowie stated that the male was 6' and had brown skin, but could not describe him further. Id. at 252-62.

Bowie testified that the other male knocked on Thompson's door and they entered his house after Thompson let them in. Bowie further testified that Thompson was older than him but could not describe him further. Bowie stated that he could not remember what color shirt Thompson was wearing, what kind of pants Thompson was wearing or what the inside of Thompson's house looked like. The Commonwealth then read from the statement Bowie gave to police on June 30, 2010. Bowie stated that on, June 9, 2010, he was stopped and arrested by the police for possessing a Glock 27 .40-caliber handgun that he did not have a permit to carry. Bowie further stated to the police that he received the Glock from Defendant that morning. Bowie testified at trial that he remembered telling this to the police, but it was untrue as the gun was his own. Bowie testified at trial that he identified a photograph of Defendant and that he told the police that Defendant was sitting in the seat behind him in the car when it was stopped. Id. at 263-76.

In his June 30, 2010 statement to police, Bowie stated to police that Defendant and Duran

10

told him they had killed an older male inside a house in Southwest Philadelphia near Defendant's house. Bowie further stated to the police that Defendant told him they thought the man had marijuana in his house and that they used the .40-caliber handguns. Bowie testified at trial that he gave these answers to the police but he lied because he did not want to get charged with possessing the gun. Bowie stated to the police that, on the morning he was arrested, Defendant and Duran arrived at Duran's sister's house with a .38-caliber revolver, a silver and black .40-caliber semiautomatic, a black .40-caliber Glock, and a .45-caliber ACP. Bowie further stated to the police that the .38-caliber gun was sold to a person named Diddy and that Duran was arrested carrying the .40-caliber HK that came from Baker. Bowie testified at trial that he used the gun that Defendant and Duran had taken from Baker on November 9, 2009 to shoot Thompson even though Thompson was actually killed on November 8th. (N.T. 5/7/2015 p. 15-25, 30-31, 111-12).

The Commonwealth called Hines as its next witness. Hines testified that he was arrested in June 2010 while in a car with Bowie and Defendant and that he gave a statement to the police on June 11, 2010. Hines stated to the police that he was arrested for carrying a revolver that Diddy had given to him. Hines further stated to the police that Duran told him that he had killed a man inside a house in Southwest Philadelphia near Defendant's house. Hines testified at trial that he remembered making that statement to the police but could not remember whether it was true because he was high on cough syrup at the time, despite earlier stating to the police that he was not under the influence of drugs or alcohol. Hines testified at trial that he identified a photograph of Duran after he finished his statement and signed his name below the photograph. Hines testified at trial that he had written multiple letters to the District Attorney asking to retract his statement because he did not want to testify against his friends at trial. Id. at 137-63.

The Commonwealth called Dr. Gary Collins ("Collins") as its next witness. Collins

11

testified that he worked at the Philadelphia Medical Examiner's Office from January 2007 to October 2014 as an assistant medical examiner and later the deputy chief medical examiner. Collins further testified that, after graduating from medical school, he did a five-year training program in pathology at the University of South Florida and a one-year training program in forensic pathology in Philadelphia. Collins stated that he was board certified in the area of anatomic, clinical and forensic pathology and that he had personally performed in excess of 2300 autopsies. Collins further testified that he had testified as an expert in the area of forensic pathology at least a few hundred times. Collins was subsequently offered and accepted by this Court as an expert in the field of forensic pathology. (N.T. 5/8/2013 p. 4-7).

Collins testified that he performed Thompson's autopsy on November 8, 2009. Collins further testified that Thompson was pronounced dead by medics on the scene at 7:46 p.m. on November 8, 2009 and his body was subsequently transported to the Medical Examiner's Office. Collins testified that Thompson had suffered a perforating gunshot wound to the head and that no bullets were recovered from the body. Collins further testified that the entrance wound was located on the back left side of Thompson's head and the exit wound was on the front right side of his head just above his hairline. Collins stated that there was no soot or stippling found on Thompson's skin. Collins testified that Thompson was wearing a pair of jeans and socks, and that there was a blood-stained white t-shirt that accompanied his body. Collins further testified that there were holes in the t-shirt and gunfire residue adjacent to the holes. Collins stated that, if the shirt was wrapped around Thompson's head, then the residue would mean that the gun was within two inches to three feet of Thompson's head when it was fired. Collins further stated that there were multiple holes in the shirt, which was consistent with the shirt being folded and one shot passing through it. Id. at 8-18.

12

Collins testified that Thompson tested positive for cocaine. Collins stated that Thompson had a small abrasion on the right side of his face and forehead and small scrapes just above his eyebrow. Collins further stated that Thompson had an area about two inches in size on his right cheek which was swollen and had two small scrapes. Collins stated that these abrasions were consistent with being struck by a blunt object. Collins testified that Thompson's injuries were consistent with a person standing or crouching over him and firing one shot through a t-shirt into the back of his head. Collins stated that, once Thompson sustained the gunshot wound, he immediately would have been incapacitated and capable of only small, involuntary movements. Collins further stated that it was possible that Thompson could have continued to breathe after sustaining the gunshot wound despite the damage to his brain. Id. at 19-25.

The Commonwealth called Abu Abdul Wakeel ("Wakeel") as its next witness. Wakeel testified that he lived near Trinity Street but could not recall knowing Brooks. Wakeel further testified that he could not recall giving a statement to the police about Thompson's death. The Commonwealth then read from the statement Wakeel gave to police on March 2, 2010. Wakeel stated to the police that Brooks told him that he had bought marijuana from Thompson and thought that he could rob him. Wakeel further stated that Brooks told him that he and two other men went to Thompson's house and knocked on the door as though he was going to buy marijuana. Brooks further told him that one of the men he was with drew a revolver after they entered the house while the other one went upstairs and found a woman there. Wakeel stated that Brooks told him that one of the men asked Thompson where the drugs were and, when Thompson refused to tell them, they shot him. Wakeel further stated to the police that Brooks told him about the murder while they were smoking marijuana together on a soccer field and would mention it on occasion thereafter. Wakeel stated to the police that Brooks told him that

13

they used a .38-caliber gun and that they had to kill Thompson because Thompson had known Brooks his entire life. Wakeel testified at trial that he could not recall giving these answers to the police. Id. at 40-63.

The Commonwealth called Officer David Marshall ("Marshall") as its next witness. Marshall testified that he worked for the Bensalem Township Police Department and that, on May 11, 2010, he went to the Lincoln Motel at 2277 Lincoln Highway. Marshall further testified that he came into contact with Duran at the location when Duran fled from a vehicle the police had been observing after the police decided to initiate a traffic stop. Marshall testified Duran fled from the passenger side towards a wooded area near the motel and that he pursued Duran into the woods. Marshall further testified that, as Duran was running, his hand was up near the right side of his hip holding what appeared to be a bulky object. Marshall testified that they identified themselves as police and told Duran to stop, but he continued to run. Marshall further testified that, as Duran ran through the woods along the Bensalem side of the Poquessing Creek, he once turned towards him and reached for the same area around his waistband that he was holding as he started to flee, but appeared to be surprised when nothing was there. Marshall stated that Duran eventually was arrested on the opposite side of the creek. Marshall testified that a .40-caliber Heckler & Koch semiautomatic with a black handgrip and a silver slide was recovered from a sandy area where Duran had earlier fallen down near the start of the chase. Marshall stated that the gun, which had the serial number 26045373, was placed on a property receipt and taken to Philadelphia. (N.T. 5/13/2015 p. 12-24).

The Commonwealth called Officer Robin Song ("Song") as its next witness. Song testified that he worked in the 12th District and that, on August 16, 2010, he went to 1836 Yewdall Street to search for Defendant. Song further testified that they knocked on the front

14

door of the property and identified themselves as police, at which time a young black male opened the door and told them that Defendant was upstairs. Song stated that they entered the house, identified themselves as police and told Defendant to come downstairs but no one answered. Song further stated that he and a couple other officers went upstairs and searched different rooms for Defendant. Song testified that he came upon a closet in one of the bedrooms that initially appeared to be filled with clothes but, upon further inspection, he noticed what appeared to be the top of a person's head. Song further testified that, after he confirmed that it was a person, he drew his weapon and told the person to put his hands up. Song stated that two hands appeared from the pile of clothes, at which time he pulled Defendant out of the closet and arrested him. Id. at 28-32.

The Commonwealth called Officer Jeff Holden ("Holden") as its next witness. Holden testified that he was a Philadelphia Police Officer and that, on April 29, 2010, he recovered a fired cartridge casing from a .40-caliber firearm as well as a projectile of an unknown caliber from 2441 Brown Street. Id. at 37-38.

The Commonwealth called Officer Joseph Murray ("Murray") as its next witness. Murray testified that he worked for the Special Investigations Unit of Southwest Detectives and that, on June 10, 2010, he took a statement from Bowie. Murray testified that he had not been looking for Bowie and had not known Bowie before he was arrested by Rapone. Murray stated that Bowie was cooperative when he gave the statement and that he did not force or threaten Bowie to give him information. Murray further stated that Bowie was provided with food and the opportunity to use the bathroom and that he did not appear to be under the influence of drugs or alcohol. Murray testified that he reviewed Bowie's rights with him prior to the statement and that Bowie signed his initials next to each right to indicate that he understood them. Id. at 40-47.

15

Murray testified that Bowie told him he had received the .40-caliber Glock 27 he had been arrested for carrying from Defendant on the morning of June 9, 2010. Bowie further told him that Defendant and Duran took the firearms from Baker. Bowie stated that they took a silver and black .40-caliber semiautomatic and a .40-caliber black Glock from Baker, to go along with a .38-caliber revolver and a .45-caliber ACP they already had. Bowie further stated that Defendant and Duran told him that they had killed an older man inside of a house in Southwest Philadelphia near Defendant's house. Bowie stated that they told him it was a home invasion, that they believed the man had marijuana in his house and that they used .40-caliber firearms. Murray testified that Bowie never expressed any hesitation as to the accuracy of the statement and that he signed each page of the statement. Id. at 47-57.

Murray testified that he took a second statement from Bowie on June 23, 2010. Murray testified that Bowie stated that, at around 5:00 a.m., he, Defendant and Duran walked from 24th and Berks to Baker's house after Duran's sister told them that Baker had guns and money at his house. Bowie further stated that Defendant and Duran stood behind Baker's truck and waited for Baker, then took a Glock 27 from Baker's hip and a HK .40-caliber gun. Bowie stated to the police that, on April 29, 2010 at 2441 Brown Street, Duran fired the .38 caliber revolver while he fired the Glock 27. Bowie further stated that Hines told him that Defendant, Duran and a young male had participated in Thompson's murder. Murray testified that Bowie signed each page of the second statement and did not express in any way that he was uncomfortable with the content of the statement or wanted to change anything about it. Murray further testified that Bowie told him that he was giving the information in the hopes of leniency and that he explained to Bowie that he could not promise anything to him nor could he receive leniency if the statements were false. Id. at 58-70.

16

Murray testified that he took a statement from Hines on June 11, 2010. Murray further testified that Hines stated that Duran told him he had killed a man inside a house in Southwest Philadelphia. Murray testified that Hines did not express any hesitation about the accuracy of the statement or ask to change it. Murray further testified that, prior to the first interview with Bowie, the only information he had about Thompson's murder was that a murder had occurred at that location in Southwest Philadelphia. Murray stated that he did not respond to the scene of Thompson's murder nor had he ever spoken to anyone at Homicide about it. Murray testified that the statements with Bowie and Hines were not primarily concerned with the murder, that he did not try to elicit further information about the murders, and that there was never any discussion that Bowie or Hines might go to jail for Thompson's murder. Id. at 73-85.

The Commonwealth called Tracy Byard ("Byard") as its next witness. Byard testified that he worked for the Homicide Unit, but was not the assigned detective on Thompson's murder. Byard testified that, on March 2, 2010, he took a statement from Wakeel in connection to the murder. Byard further testified that he recorded Wakeel's answers verbatim and that Wakeel had the opportunity to review his statement. Byard testified that Wakeel signed each page of the statement to indicate that the statement was correct. Id. at 118-21.

The Commonwealth called Detective Thomas DeMalto ("DeMalto") as its next witness. DeMalto testified that he was assigned to Central Detectives and that, on November 9, 2009, he took a statement from Baker. DeMalto further testified that Baker told him that three individuals came to his house and took his two .40-caliber guns. DeMalto testified that one of the firearms taken from Baker was a black and silver Heckler & Koch .40-caliber handgun with the serial number 26045373 while the other one was a black Glock .40-caliber handgun with the serial number KZZ043. DeMalto further testified that the serial number on the Heckler & Koch .40-

17

caliber recovered from Duran by Bensalem detectives matched the serial number of the Heckler & Koch .40-caliber handgun that was stolen from Baker while the firearm recovered from Bowie by Rapone on June 9, 2010 had the same serial number as the Glock that was taken from Baker. Id. at 137-46.

The Commonwealth called Officer Michael Maresca ("Maresca") as its next witness. Maresca testified that he was assigned to the Crime Scene Unit and that, on November 8, 2009, he investigated the crime scene at 6726 Trinity Street. Maresca stated that, before he entered the property, he searched for ballistic evidence or weapons but could not find any. Maresca testified that, when he entered the property, he looked to his left and saw Thompson lying on his back with his feet towards the door and his head towards the stairs. Maresca further testified that Thompson appeared to have a wound to his head and, when he approached him, he could see that there was a hole in his head. Maresca stated that he lifted Thompson's head and saw that there was a projectile underneath him. Maresca further stated that there was a t-shirt underneath Thompson's head and that his pants had fallen down to his knees. (N.T. 5/14/2015 p. 5-9).

Maresca testified that the projectile had mushroomed out and was found in a pool of blood on top of the t-shirt. Maresca further testified that he did not find any other ballistic evidence inside the house. Maresca stated that he tested some items found at the crime scene for DNA, but there was not enough to form a complete profile. Maresca further stated that he was unable to find any fingerprints that were of use in the investigation. Maresca testified that, because no fired cartridge casing was found, it was probable that a revolver was used because the fired cartridge casing remains in the gun after a revolver had been fired. Maresca further testified that he submitted the projectile that was found to Kenneth Lay ("Lay") of the Firearms Identification Unit. Id. at 9-18.

18

The Commonwealth called Lay as its next witness. Lay testified that he was previously assigned to the Firearms Identification Unit as a supervisor and that he had worked for the Firearms Identification Unit for 19 years. Lay further testified that he underwent a three-year training program to join the unit and that he subsequently engaged in further training at the FBI laboratory, the ATF and various firearms manufacturers. Lay stated that he had been qualified as an expert in firearms identification 286 times in state and federal court. Lay was subsequently offered and accepted by this Court as an expert in firearms identification. Id. at 42-47.

Lay testified that the firearm recovered from Hines was a .38-caliber Lady Smith & Wesson special revolver with the serial number BDV1577. Lay further testified that the revolver came with four live rounds of ammunition and one fired cartridge casing. Lay stated that the bullet recovered from the murder scene was a .38-caliber bullet, while the projectile recovered from 2441 Brown Street on April 29, 2010 was also a .38-caliber bullet. Lay further stated that he compared the two projectiles to the .38-caliber gun that was recovered from Hines and was able to determine that the projectile recovered at 2441 Brown Street was fired from that particular gun. Lay testified that, in regards to the bullet recovered from Thompson's murder, the class characteristics of the bullet matched those of the revolver recovered from Hines but he was unable to determine whether the bullet was fired from that particular firearm due to damage to the bullet and corrosion in the gun barrel. Lay further testified that the damage to the bullet could have been caused by the impact with Thompson's head. Id. at 60-69.

The Commonwealth called Detective David Schmidt ("Schmidt") as its next witness. Schmidt testified that he worked for the Homicide Unit and was the assigned detective for Thompson's murder. Schmidt further testified that Duran was arrested on May 11, 2010 and that at the time of his arrest, he was 26 years old, weighed 150 pounds and was 5'6" tall.

19

Schmidt testified that Brooks would not have had access to the statements of Bowie or Hines. Schmidt further testified that he first learned of the statements that Bowie and Hines gave shortly before Defendant and Duran were arrested and after Brooks gave his statement. Schmidt testified that, based on those statements, arrest warrants were obtained for Defendant and Duran. Schmidt stated that Bowie, Wakeel and Hines never contacted him about changing their statements. Id. at 84-108.

The Commonwealth read a stipulation, by and between counsel, that Defendant and Duran did not have a license to carry a firearm in the state of Pennsylvania. The Commonwealth further moved a certificate of non-licensure into evidence, which showed that, on November 8, 2009, neither Defendant nor Duran possessed a valid license to carry a firearm nor a valid sportsman's firearm permit. After moving the certificate of non-licensure into evidence, the Commonwealth and Defendant rested. Id. at 161-62, 168.

## DISCUSSION

I. **WHETHER THE COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO DISMISS THE INFORMATION BASED ON DELAY.**

II. **WHETHER THE COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION.**

III. **WHETHER THE COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO EXCLUDE PRIOR BAD ACTS EVIDENCE AND GRANTED THE COMMONWEALTH'S MOTION TO ADMIT PRIOR BAD ACTS EVIDENCE.**

IV. **WHETHER THE COURT ERRED WHEN IT LIMITED DEFENDANT'S CROSS-EXAMINATION OF A WITNESS ON THE POTENTIAL PRISON SENTENCE HE WAS FACING.**

V. **WHETHER THE COURT ERRED WHEN IT INSTRUCTED THE JURY THAT THE PRIOR STATEMENTS OF CERTAIN WITNESSES COULD BE CONSIDERED AS SUBSTANTIVE EVIDENCE.**

20

**VI.** **WHETHER THE COURT ERRED IN GIVING A FLIGHT INSTRUCTION.**

**VII.** **WHETHER THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF ALL CHARGES.**

**VIII.** **WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.**

## DISCUSSION

**I.** **THE COURT DID NOT ERR WHEN IT DENIED DEFENDANT'S MOTION TO DISMISS THE INFORMATION BASED ON DELAY.**

This Court did not err when it denied Defendant's motion to dismiss the information based on the delay from when the murder occurred until when Defendant was arrested. It is well-settled that the passage of time between crime and arrest is not a matter within the context of Sixth Amendment speedy trial rights. Only a formal indictment, information or arrest, any of which binds an accused to respond to a criminal charge, invokes Sixth Amendment privileges. Commonwealth v. Trippett, 2007 PA Super 260, 932 A.2d 188, 195 (2007) (citing Commonwealth v. Akers, 392 Pa.Super. 170, 572 A.2d 746, 758 (1990)). However, pre-arrest delay constitutes a due process violation where there has occurred "actual prejudice to the defendant" and there existed "no proper reasons for postponing the defendant's arrest." Commonwealth v. Wright, 2004 PA Super 484, 865 A.2d 894, 901 (2004) (citing Commonwealth v. Snyder, 761 A.2d 584, 605 (Pa.Super.2000)). In order for a defendant to show actual prejudice, he or she must show that he or she was meaningfully impaired in his or her ability to defend against the state's charges to such an extent that the disposition of the criminal proceedings was likely affected. This kind of prejudice is commonly demonstrated by the loss of documentary evidence or the unavailability of an essential witness. Commonwealth v. Messersmith, 2004 PA Super 401, 860 A.2d 1078, 1091 (2004) (citing Commonwealth v. Scher,

21

569 Pa. 284, 803 A.2d 1204 (2002)). It is not sufficient for a defendant to make speculative or conclusory claims of possible prejudice as a result of the passage of time. Id. Even in the face of prejudice, delay is excusable if it is a derivation of reasonable investigation. Wright, 865 A.2d at 901 (citing Snyder, 761 A.2d at 587). Only in situations where the evidence shows that the delay was the product of intentional, bad faith, or reckless conduct by the prosecution, however, will the courts find a violation of due process. Commonwealth v. Jette, 2003 PA Super 69, 818 A.2d 533, 536 (2003) (citing Scher, 803 A.2d at 1221-22).

In the case at bar, Defendant filed a motion to dismiss the information based on the delay in arresting him for Thompson's murder. Defendant argued that, as Thompson was killed on November 8, 2009 but he was not arrested on the murder charge until several years later, the delay in arresting him prejudiced him and thereby violated his due process rights. Defendant further argued that the delay would have affected the memory of potentially exculpatory witnesses and therefore made him unable to find any alibi witnesses. The Commonwealth argued that the delay was caused solely because no one was able to identify Defendant as a participant in the murder until Brooks agreed to proffer evidence and that Defendant was arrested on Thompson's murder within a month after Brooks had identified him. This Court subsequently denied Defendant's motion and stated that the delay in arresting Defendant was not intentional, reckless or even negligent. This Court noted that Defendant was arrested one month after he was identified by Brooks and that the only other person present at the scene, Fahnbulleh, had been unable to identify him. (N.T. 4/20/2015 p. 6-12).

This Court did not err when it denied Defendant's motion to dismiss the information based on the delay in his arrest. As this Court noted, the delay was not the product of intentional, bad faith, or reckless conduct by the prosecution. Rather, the delay was caused by the inability

22

of anyone to identify Defendant as being involved in the murder until Brooks decided to proffer evidence to the Commonwealth. Once Brooks identified Defendant as being involved in the murder, he was promptly arrested one month later. Moreover, the prejudice that Defendant claimed he suffered due to the passage of time was purely speculative. Defendant did not claim that the delay resulted in the loss of documentary evidence or the unavailability of an essential witness but merely claimed that he was unable to find an alibi witness, which he speculated was attributable to the delay. Significantly, despite a similar delay, co-defendant Duran was nonetheless able to find an alibi witness to testify on his behalf. Thus, the Commonwealth did not act intentionally, recklessly or in bad faith in delaying Defendant's arrest for Thompson's murder and any prejudice that Defendant suffered as a result was purely speculative. Therefore, this Court did not err when it denied Defendant's motion to dismiss the information based on the delay.

## II. THIS COURT DID NOT ERR WHEN IT DENIED DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION.

This Court did not err when it denied Defendant's motion to suppress the identification made by Bowie and Hines. In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable. Commonwealth v. Davis, 17 A.3d 390, 394 (Pa.Super. 2011) (citing Commonwealth v. Moye, 836 A.2d 973, 976 (Pa.Super.2003)). While the suggestiveness of the identification procedure is one relevant factor in determining the reliability of an identification, "[s]uggestiveness alone will not forbid the use of an identification, if the reliability of a subsequent identification can be sustained." Id. (quoting Commonwealth v. McGaghey, 510 Pa. 225, 228, 507 A.2d 357, 359 (1986)). Suggestiveness arises when the police employ an identification procedure that emphasizes or singles-out a suspect. Id. (citing Simmons v. United States, 390 U.S. 377, 383

23

(1968)). To establish reliability in the wake of a suggestive identification, the Commonwealth must prove, through clear and convincing evidence, the existence of an independent basis for the identification. Id. (citing Commonwealth v. Fisher, 564 Pa. 505, 523, 769 A.2d 1116, 1127 (2001)). When the witness already knows the defendant, this prior familiarity creates an independent basis for the witness's identification of the defendant. Commonwealth v. Reid, 99 A.3d 427, 448 (Pa. 2014) (citing Commonwealth v. Ali, 608 Pa. 71, 10 A.3d 282, 303 (2010)).

In the case at bar, Defendant filed a motion to suppress identifications made by Bowie and Hines while they were in police custody. Defendant argued that, as Bowie and Hines were each shown only one photo of Defendant instead of an eight-picture photo array, the identification procedure was unduly suggestive. The Commonwealth argued in response that Bowie and Hines had a prior relationship with Defendant and were in fact driving in a car with Defendant when they were stopped and arrested by the police. The Commonwealth further argued that prior case law held that a single photograph was appropriate in situations where the witness had a prior relationship with the defendant. This Court denied Defendant's motion to suppress identifications made by Hines and Bowie and stated that a single photograph is appropriate in situations where the identifier has a prior relationship with the subject. (N.T. 4/20/2015 p. 20-25).

This Court did not err when it denied Defendant's motion to suppress identifications made by Bowie and Hines. As the Commonwealth accurately noted, both Bowie and Hines had a prior existing relationship with Defendant and were in fact travelling in the same car with Defendant when they were stopped and arrested by the police. Moreover, Hines testified at trial and described Defendant as his friend. Furthermore, Bowie gave a statement to the police regarding prior, friendly conservations that he had with Defendant to the extent that Defendant

24

confided with him about the Thompson shooting. Thus, as both Bowie and Hines already knew Defendant and were in fact friends with him, this prior familiarity created an independent basis for their identification of Defendant while they were in police custody and thereby established the reliability of that identification. Therefore, this Court did not err when it denied Defendant's motion to suppress identifications made by Bowie and Hines.

### III. THIS COURT DID NOT ERR WHEN IT DENIED DEFENDANT'S MOTION TO EXCLUDE PRIOR BAD ACTS EVIDENCE AND GRANTED THE COMMONWEALTH'S MOTION TO ADMIT PRIOR BAD ACTS EVIDENCE.

This Court did not err when it denied Defendant's motion to exclude evidence that Brooks and Defendant had used drugs together prior to the incident, nor did the Court err when it granted the Commonwealth's motion to introduce evidence that Defendant robbed Baker the morning after the murder and that Hines and Bowie were in possession of a .40-caliber handgun and .38-caliber revolver when they were arrested with Defendant. It is well established that the admissibility of evidence is solely within the discretion of the trial court and its decision will not be disturbed on appeal absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law or an exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. Commonwealth v. Tyson, 2015 PA Super 138, 119 A.3d 353, 357-58 (2015) (citing Commonwealth v. Harris, 884 A.2d 920, 924 (Pa.Super.2005)).

Where the trial court has stated a "reason for its decision, the scope of review is limited to an examination of the stated reason." Commonwealth v. Weakley, 2009 PA Super 74, 972 A.2d 1182, 1189 (quoting Commonwealth v. Strong, 825 A.2d 658, 665 (Pa.Super.2003)). An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion. Commonwealth v. Perry, 612 Pa. 557, 32 A.3d 232, 236 (2011) (quoting

25

Commonwealth v. Walls, 592 Pa. 557, 926 A.2d 957, 961 (2007)). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. Commonwealth v. Lopez, 2012 PA Super 161, 57 A.3d 74, 81 (2012). An evidentiary error of the trial court will be deemed harmless on appeal where the appellate court is convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict. Commonwealth v. Patterson, 625 Pa. 104, 91 A.3d 55 (2014) (citing Commonwealth v. DeJesus, 584 Pa. 29, 880 A.2d 608, 614 (2005)).

While it is true that evidence of prior crimes and bad acts is generally inadmissible if offered for the sole purpose of demonstrating the defendant's bad character or criminal propensity, the same evidence may be admissible where relevant for another purpose. Commonwealth v. Powell, 598 Pa. 224, 956 A.2d 406, 419 (2008) (citing Commonwealth v. Kemp, 562 Pa. 154, 753 A.2d 1278, 1284 (2000)). Such relevant purposes include showing the defendant's motive in committing the crime on trial, the absence of mistake or accident, a common scheme or design, or to establish identity. Id. The trial court is not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." Commonwealth v. Page, 2009 PA Super 20, 965 A.2d 1212, 1220 (2009) (quoting Commonwealth v. Dillon, 592 Pa. 351, 925 A.3d 131, 141 (2007)). Such evidence may be admitted, however, only if the probative value of the evidence outweighs its potential for unfair prejudice. Commonwealth v. Hairston, 84 A.3d 657, 665 (Pa. 2014). In conducting this balancing test, courts must consider factors such as the strength of the "other crimes" evidence, the similarities between the crimes, the time lapse between crimes, the need for the other crimes evidence, the efficacy of alternative proof of the charged crime, and

26

"the degree to which the evidence probably will rouse the jury to overmastering hostility." Commonwealth v. Brown, 2012 PA Super 150, 52 A.3d 320, 326 (2012) (citing Commonwealth v. Frank, 395 Pa.Super. 412, 577 A.2d 609 (1990)).

The general rule is that where weapon evidence cannot be specifically linked to a crime, such evidence is not admissible. Commonwealth v. Owens, 2007 PA Super 213, 929 A.2d 1187, 1191 (2007) (citing Commonwealth v. Robinson, 554 Pa. 293, 721 A.2d 344, 351 (1998)). The exception to this general rule is where the accused had a weapon or implement suitable to the commission of the crime charged. This evidence is always a proper ingredient of the case for the prosecution. Id. (citing Robinson, 721 A.2d at 351). A weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime. Id. (citing Commonwealth v. Broaster, 2004 PA Super 458, 863 A.2d 588, 592 (2004)). Uncertainty whether the weapon evidence was actually used in the crime goes to the weight of such evidence, not its admissibility. Id. (citing Commonwealth v. Williams, 537 Pa. 1, 640 A.2d 1251, 1260 (1994)).

### 1.    Defendant's prior drug use with Brooks.

In the case at bar, Defendant filed a motion in limine to preclude evidence that Brooks and Defendant had smoked marijuana together in the past and that Defendant had provided Brooks with drugs in the past. Defendant argued that the prejudicial effect of this evidence outweighed its probative value, that Defendant's alleged prior criminal activity with Brooks was not relevant as to his involvement in Thompson's homicide, and that the evidence was being used as propensity evidence. The Commonwealth argued in response that the evidence of their

27

prior drug use together was admissible to show the relationship between Brooks and Defendant and to establish their motive for robbing Thompson, as Thompson had sold Brooks marijuana previously. This Court denied Defendant's motion to exclude evidence that Defendant and Brooks had used marijuana together and that Defendant previously had supplied Brooks with drugs. This Court stated that the case law showed that a defendant's prior drug use is admissible when that evidence was relevant to establish the defendant's motive and cited to Commonwealth v. Romero and Commonwealth vs. Edwards in support. (N.T. 4/20/2015 p. 30-49); *See* Commonwealth v. Romero, 938 A.2d 362 (Pa. 2007); *see also* Commonwealth v. Edwards, 903 A.2d 1139 (Pa. 2006).

Thus, this Court did not err when it denied Defendant's motion to exclude evidence that Brooks and Defendant had smoked marijuana together in the past and that Defendant had provided Brooks with drugs in the past. Rather than being used for propensity purposes, the evidence was admissible to explain how Brooks knew Defendant and their motive for robbing Thompson, as Brooks previously had bought marijuana from Thompson in the past and they wanted to steal marijuana from him. Moreover, the prejudice that would have resulted from the evidence was minimal, as the jury heard evidence from other witnesses, including Defendant's own admission to Bowie, that they went to Thompson's house to rob him of marijuana. Furthermore, even if this Court erred in its pre-trial ruling, any such error was harmless as such testimony was never developed, i.e. Brooks never testified that he had smoked marijuana with Defendant or that Brooks previously had provided Defendant with marijuana. As a result, the jury never heard the challenged evidence and it therefore could not have possibly contributed to their verdict. Thus, this Court did not err when it denied Defendant's motion to exclude evidence that Brooks had previously used marijuana with Defendant and that Defendant had

28

previously provided Brooks with marijuana, and even if this Court had erred any such error was harmless.

## 2. Firearms Evidence.

In the case at bar, the Commonwealth filed a motion in limine to admit evidence that Defendant and Duran robbed Baker on November 9, 2009 using the same guns that they had used in Thompson's murder, and that Bowie and Hines were subsequently arrested while in possession of a .40-caliber semiautomatic stolen from Baker and a .38-caliber revolver with the same class characteristics as the bullet recovered from underneath Thompson's head. The Commonwealth argued that the case law consistently allowed evidence of separate criminal incidents where the same or similar guns were used in order to show identity. The Commonwealth cited Commonwealth v. Reid, in which evidence of a murder committed with the same gun six days after the crime at issue was admissible to show identity, and Commonwealth v. Cousar, in which evidence of a robbery and two murders committed more than 30 days apart was properly admissible to show identity. *See* Commonwealth v. Reid, 626 A.2d 118 (Pa. 1993); *see also* Commonwealth v. Cousar, 928 A.2d 1025 (Pa. 2007). The Commonwealth further argued that the evidence was essential to prove identity, as the .38-caliber revolver used during the robbery and recovered from Hines was the same as those used in Thompson's murder and Duran and Bowie were subsequently arrested while in possession of the firearms stolen from Baker. Defendant argued that Baker did not identify Defendant or Duran as the person who robbed him and did not describe the gun used as anything other than that it may have been a .38-caliber. This Court ruled that the Commonwealth could introduce the evidence. Id. at 54-60, 90, 100-02, 109, 113-15.

This Court did not err when it allowed the Commonwealth to introduce evidence that

29

Defendant and Duran robbed Baker on the morning of November 9, 2009 with the same type of firearm used to kill Thompson on the night of November 8, 2009. Brooks testified that Duran shot Thompson using a .38-caliber revolver with a barrel that was approximately four inches in length. Baker testified that one of the men who robbed him was in possession of a .38-caliber revolver with a barrel that was approximately three inches in length when Defendant and Duran took his guns. Thus, evidence that Baker was robbed by Defendant and Duran with a weapon similar to the one used in perpetration of the crime on the morning after the murder was properly admissible to prove Defendant's identity as a participant in Thompson's murder. Any uncertainty as to whether the .38-caliber revolver possessed by them on the morning of November 9, 2009 was the same as the .38-caliber revolver Duran possessed on the night of November 8, 2009 went to the weight that the jury placed upon the evidence, not to its admissibility.

Moreover, this Court did not err when it allowed the Commonwealth to introduce evidence that Bowie and Hines were subsequently arrested while in possession of a .40-caliber semiautomatic stolen from Baker and a .38-caliber revolver with the same class characteristics as the bullet recovered from underneath Thompson's head. Brooks testified that on November 8, 2009, Duran shot Thompson once in the head using a .38-caliber revolver. Baker testified that, on November 9, 2009, three men, one of whom was carrying a .38-caliber revolver, robbed him of his .40-caliber Glock and .40-caliber Heckler & Koch. Rapone testified that Bowie and Hines were arrested while driving in the same car as Defendant and that a .40-caliber semiautomatic was recovered from Bowie and a .38-caliber revolver was recovered from Hines. Bowie stated to the police that he received the .40-caliber firearm from Defendant and that the .38-caliber revolver was sold by Defendant to a person named Diddy. Hines stated to the police that he

30

received the .38-caliber revolver from Diddy. DeMalto testified that the gun recovered from Bowie had the same serial number as the black Glock .40-caliber handgun stolen from Baker, while Lay testified that the .38-caliber revolver matched a projectile recovered from 2441 Brown Street and had the same class characteristics as the .38-caliber bullet found underneath Thompson's head. Thus, this evidence strongly tended to prove that Defendant had ready access to a weapon of the same style and with the same class characteristics as the one used in the perpetration of Thompson's murder. Therefore, this Court did not err when it allowed the Commonwealth to introduce evidence that Bowie and Hines were arrested while carrying the .40-caliber semiautomatic and the .38-caliber revolver.

IV. **THIS COURT DID NOT ERR WHEN IT LIMITED DEFENDANT'S FROM CROSS-EXAMINATION OF A WITNESS ON THE POTENTIAL PRISON SENTENCE HE WAS FACING.**

This Court did not err when it prohibited Defendant from cross-examining Brooks on the possible life sentence he was facing prior to pleading guilty in Thompson's murder. The "scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion." Commonwealth v. Chmiel, 585 Pa. 547, 889 A.2d 501, 527 (2005) (citing Commonwealth v. Gibson, 547 Pa. 71, 688 A.2d 1152, 1167 (1997)). A trial court may limit the scope of cross-examination to prevent repetitive inquiries and cumulative testimony. Commonwealth v. Conde, 822 A.2d 45, 51 (Pa.Super. 2003) (citing Commonwealth v. Mobley, 424 Pa.Super. 385, 622 A.2d 972, 976 (1993)). Cross-examination may be employed to test a witness' story, to impeach credibility, and to establish a witness' motive for testifying. Chmiel, 889 A.2d at 527 (citing Commonwealth v. Robinson, 507 Pa. 522, 491 A.2d 107 (1985)). A defendant has a right to "impeach by showing bias, i.e., to challenge the witness's self-interest "by questioning him about possible or actual favored treatment by the prosecuting

31

authority." Commonwealth v. Causey, 2003 PA Super 351, 833 A.2d 165, 169 (2003) (quoting Commonwealth v. Evans, 511 Pa. 214, 512 A.2d 626, 632 (1986)). Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it. Commonwealth v. Sattazahn, 563 Pa. 533, 763 A.3d 359, 364 (2000) (quoting Commonwealth v. Hill, 523 Pa. 270, 566 A.2d 252 (1989)). The jury may choose to believe the witness even after it learns of actual promises made or possible promises of leniency which may be made in the future, but the defendant, under the right guaranteed in the Pennsylvania Constitution to confront witnesses against him, must have the opportunity at least to raise a doubt in the mind of the jury as to whether the prosecution witness is biased. Id.

In the case at bar, the following exchange took place during Duran's cross-examination of Brooks,

> "MR. KAUFFMAN: If you wouldn't have done this deal with the district attorney's office, and you went to trial, sir, what were you facing for the robbery and murder of Rush Thompson?
>
> BROOKS: 40 to 80.
>
> MR. KAUFFMAN: No deal. You're going to trial. You're sitting at that table. What were you facing for robbery and murder and conspiracy?
>
> BROOKS: 40 to 80.
>
> MR. KAUFFMAN: Sir, you were facing life imprisonment?"

(N.T. 5/6/2015 p. 68). The Commonwealth objected and argued that the question had been asked and answered. The Commonwealth further argued that it was Brooks' own understanding of his possible sentence which was relevant to show his bias and that Brooks understood the potential

32

sentence he was facing to be 40 to 80 years imprisonment. Defendant argued Brooks had been in jail for 3 years prior to agreeing to a plea deal, that defense counsel should be allowed to ask a leading question about the possibility of a life sentence and that the evidence that Brooks was facing a possible life sentence would be used solely for impeachment purposes. This Court stated that Brooks already had been asked and answered twice that he believed he was facing a maximum sentence of 40 to 80 years and that defense counsel was not entitled then to engage in teaching Brooks on the witness stand that he, and by extension both defendants, faced a life sentence if he was found guilty of 1st or 2nd-degree murder at trial. Id. at 69-83.

This Court did not err when it prohibited Defendant from cross-examining Brooks about the potential life sentence that he was facing had he not pled guilty to Thompson's murder. As the Commonwealth noted, Brooks answered twice that he believed he was facing a possible sentence of 40 to 80 years in prison had he gone to trial and apparently was unaware or did not believe that he was facing a possible life sentence had he gone to trial. Thus, the jury heard Brooks' motivation to testify against Defendant, his belief that he was facing a possible prison sentence of 40 to 80 years, and the fact that he was facing a possible life sentence was irrelevant to his motivation or bias, as he unaware that he was facing a possible life sentence. In addition, this Court allowed Defendant to ask the following questions based upon Brooks' understanding of his potential sentence on cross-examination, "And 102 years, you'd be 102 years old if you had to serve the maximum of that, correct?", to which Brooks replied "Yes,", and "Which would essentially be a life sentence, because I don't think you expect to live past 102 years old?", to which Brooks replied, "Yes." (N.T. 5/6/2015 p. 124-25). Thus, the jury heard that Brooks' motive to testify against Defendant was to avoid a potential sentence that he saw as a life sentence. Moreover, as the Commonwealth further noted, Brooks had already been asked twice

33

about the potential sentence he faced and answered twice that he believed he was facing a possible sentence of 40 to 80 years in prison. Thus, to allow a third question on the subject would have been repetitive and cumulative. Therefore, this Court did not err when it prohibited Defendant from further repetitive cross-examination of Brooks about the possible life sentence that he was facing.

### V. THIS COURT DID NOT ERR WHEN IT INSTRUCTED THE JURY THAT THE PRIOR STATEMENTS OF CERTAIN WITNESSES COULD BE CONSIDERED AS SUBSTANTIVE EVIDENCE.

This Court did not err when it instructed the jury that the prior statements of Bowie, Hines, Brooks and Wakeel could be considered as substantive evidence rather than merely for impeachment. The general rule is that a prior inconsistent statement of a declarant is admissible to impeach the declarant. Commonwealth v. Henkel, 2007 PA Super 333, 938 A.2d 433, 443 (2007) (citing Commonwealth v. Brady, 510 Pa. 123, 507 A.2d 66, 68 (1986)). In Brady, the Supreme Court of Pennsylvania reconsidered the longstanding rule that prior inconsistent statements of a non-party witness could only be used to impeach the credibility of the witness, not as substantive evidence to prove the truth of the matters asserted therein. Commonwealth v. Buford, 2014 PA Super 224, 101 A.3d 1182, 1199 (2014) (citing Commonwealth v. Wilson, 550 Pa. 518, 707 A.2d 1114, 1115–1117 (1998)). Inconsistent statements made by a witness prior to the proceeding at which he is then testifying are admissible as substantive evidence of the matters they assert so long as those statements, when given, were adopted by the witness in a signed writing or were verbatim contemporaneous recordings of oral statements. Commonwealth v. Stays, 2013 PA Super 170, 70 A.3d 1256, 1261 (2013) (citing Commonwealth v. Presbury, 445 Pa.Super. 362, 665 A.2d 825, 831–32 (1995)). Significantly, it is not imperative that the defendant actually cross-examine the witness; if the defendant had an adequate opportunity to do

34

so with full knowledge of the inconsistent statement, the mandate of Rule 803.1 is satisfied. Id. at 1262

In the case at bar, Defendant objected after this Court indicated that it would instruct the jury that the prior inconsistent statements of Bowie, Hines, Brooks and Wakeel could be considered as substantive evidence rather than merely for impeachment. Defendant argued that the case law required the Commonwealth to prove that the statements have sufficient indicia of reliability and trustworthiness before they were admitted as substantive evidence and that the Commonwealth had not satisfied that requirement in the instant case. The Commonwealth argued in response that there was a tremendous amount of corroboration among the statements and that, in fact, each statement uniformly identified Defendant and Duran as the murderers. The Commonwealth further argued that the circumstances surrounding the statements in the instant case were fundamentally different from the facts in the case cited by Defendant, in which there was only one statement that was given while the declarant was under the influence of drugs and alcohol. See Commonwealth v. Grimes, 436 Pa.Super. 535, 648 A.2d 538, 544 (1994). This Court subsequently overruled Defendant's objection. (N.T. 5/15/2015 p. 116-21).

This Court did not err when it instructed the jury that the prior statements of Bowie, Hines, Brooks and Wakeel could be considered as substantive evidence rather than merely for impeachment purposes. Each of the statements were adopted by the respective witness in a signed writing and were verbatim contemporaneous recordings of oral statements. Moreover, each statement had sufficient indicia of reliability and trustworthiness to allow them to be considered as substantive evidence. Notably, there was a significant degree of corroboration among all of the statements. Brooks stated to the police that he, Defendant, and Duran participated in a home invasion robbery at Thompson's house in Southwest Philadelphia, during

35

which Thompson was killed after they failed to find any marijuana. Bowie stated to the police that Defendant and Duran told him they had killed an older male inside a house in Southwest Philadelphia and that they thought the man had marijuana in his house. Hines stated to the police that Duran told him that he had killed a man inside a house in Southwest Philadelphia near Defendant's house. Wakeel stated to the police that Brooks told him that he and two other men thought they could rob Thompson of marijuana but then shot Thompson after they were unable to find any marijuana. Thus, the statements of each witness displayed sufficient indicia of reliability and trustworthiness based upon their substantial degree of corroboration and consistency. Therefore, this Court did not err when it instructed the jury that the prior statements of Brooks, Bowie, Hines, and Wakeel could be considered as substantive evidence.

## VI. THIS COURT DID NOT ERR IN GIVING A FLIGHT INSTRUCTION.

This Court did not err when it gave a flight instruction to the jury. Instructions on defenses or theories of prosecution are warranted when there is evidence to support such instructions. Commonwealth v. Chambers, 602 Pa. 224, 980 A.2d 35, 49 (2009) (citing Commonwealth v. Browdie, 543 Pa. 337, 671 A.2d 668, 674 (1996)). Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error. Commonwealth v. Charleston, 2014 PA Super 116, 94 A.3d 1012, 1021 (2014) (quoting Commonwealth v. Antidormi, 84 A.3d 736, 754 (Pa.Super.2014)). A flight instruction is proper when a person has reason to know he is wanted in connection with a crime, and proceeds to flee or conceal himself from the law enforcement authorities, such evasive conduct is evidence of guilt and may form a basis, in connection with other proof, from which guilt may be inferred. Commonwealth v. Thoeun Tha, 2013 PA Super 68, 64 A.3d 704, 714 (2013) (citing Commonwealth v. Harvey, 514 Pa. 531, 526 A.2d 330, 334 (1987)). A defendant's knowledge may be inferred from the

36

circumstances attendant to his flight. Id. (citing Commonwealth v. Johnson, 576 Pa. 23, 838 A.2d 663, 681 (2003)).

In the case at bar, this Court read the following instruction to the jury,

> "In addition, there was evidence including the testimony of [Marshall] that [Duran] fled from the police on May 11th, 2010, and the testimony of [Rapone] that [Defendant] fled from the police on 6/9/2010 and additional evidence that [Defendant] hid or concealed himself on 8/6/2010 when an arrest or search warrant was being served.
> The credibility, weight and effect of this evidence is for you to decide. Generally speaking, when a crime has been committed and a person thinks he is or may be accused of committing it and he flees or conceals himself or hides, such flight or concealment is a circumstance tending to prove the person is conscious of guilt.
> Such flight or concealment or hiding does not necessarily show consciousness of guilt in every case. A person may flee or hide or conceal themselves for some other motive and may do so even though innocent. Whether the evidence of flight or concealment or hiding in this case should be looked at as tending to prove guilt depends upon the fact and circumstances of this case and especially upon motive that may have prompted the flight, hiding or concealment. You may not find each defendant guilty solely on the basis of flight, hiding or concealment."

(N.T. 5/15/2015 p. 139-140). Defendant had previously objected to the characterization of Defendant having engaged in flight twice and this Court overruled the objection on the basis that the evidence showed that Defendant had fled and hidden himself from the police on two separate occasions. (N.T. 4/20/2051 p. 116-24).

This Court did not err when it gave a flight instruction to the jury that made reference to the June 9, 2010 incident in which Defendant ran away from Rapone. Rapone testified at trial that, on that day, he and his partner stopped a car carrying Defendant, Bowie and Hines and that he began to search Defendant after taking him out of the car. Rapone further testified that he stopped searching Defendant after his partner yelled "gun" and that Defendant subsequently ran southbound on 5th Street and westbound on Somerset before they lost him. Rapone further stated that no drugs were recovered from the vehicle, but a .38-caliber revolver was recovered from

37

Hines. As the stop occurred a few months after Thompson was murdered and the gun used to shoot Thompson was in the car with him, Defendant had reason to believe that he might be wanted in connection with that crime and he subsequently fled from the police. Thus, the evidence presented at trial supported a flight instruction in relation to the June 9, 2010 traffic stop and this Court's instruction accurately reflected the law on the matter. Moreover, if any prejudice accrued to Defendant as a result, it was minimal as it was undisputed that Defendant subsequently hid and concealed himself from police on August 16, 2010. Defendant was found beneath a pile of clothing while hiding himself in a 2nd floor bedroom closet, even though police were calling his name. Therefore the jury had an entirely independent basis to determine whether Defendant's actions indicated a consciousness of guilt. Furthermore, this Court instructed the jury that such flight or concealment did not necessarily show consciousness of guilt and could have derived from some other motive, including an entirely innocent motive. Therefore, this Court did not err when it gave a flight instruction to the jury on the basis of Defendant's actions on June 9, 2010.

## VII. THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY ON ALL CHARGES.

### 1. Sufficiency of the evidence.

A review of the sufficiency of the evidence to support a conviction requires that the evidence be reviewed in the light most favorable to the Commonwealth as verdict winner. Commonwealth v. Levy, 2013 PA Super 331, 83 A.3d 457, 461 (2013) (quoting Commonwealth v. Williams, 871 A.2d 254, 259 (Pa.Super. 2005)). The Commonwealth is also entitled to all favorable inferences which may be drawn from the evidence. Commonwealth v. Kelly, 2013 PA Super 276, 78 A.3d 1136, 1139 (2013) (citing Commonwealth v. Hopkins, 67 A.3d 817, 820 (Pa.Super. 2013)). The evidence put forth by the Commonwealth will be considered sufficient if

38

it establishes each material element of the crime beyond a reasonable doubt, even if by wholly circumstantial evidence. Commonwealth v. Franklin, 2013 PA Super 153, 69 A.3d 719, 722 (2013) (citing Commonwealth v. Brewer, 876 A.2d 1029, 1032 (2001)).

When determining whether the evidence is sufficient to support a guilty verdict, the appellate court must examine the entire trial record and consider all of the evidence actually received. Commonwealth v. Graham, 2013 PA Super 306, 81 A.3d 137, 142 (2013) (quoting Commonwealth v. Brown, 23 A.3d 544, 559-60 (Pa.Super 2011)). However, the trier of fact is entitled to believe all, part or none of the evidence received at trial and the appellate court cannot substitute its judgment for that of the fact-finder. Commonwealth v. Fabian, 2013 PA Super 6, 60 A.3d 146, 151 (2013) (quoting Commonwealth v. Jones, 886 A.2d 689, 704 (Pa.Super. 2005)). The facts and circumstances established by the Commonwealth need not eliminate any possibility of the defendant's innocence; rather, any doubt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact could be concluded. Commonwealth v. Stays, 2013 PA Super 170, 70 A.3d 1256, 1266 (2013) (citing Commonwealth v. Aguado, 760 A.2d 1181, 1185 (Pa.Super. 2000)).

### 2. The evidence was sufficient to find Defendant guilty of second-degree murder.

The evidence presented at trial was sufficient to find Defendant guilty of second-degree murder. A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being. 18 Pa.C.S.A. § 2501(a). A criminal homicide constitutes murder of the second degree when it is committed while the defendant was engaged as a principal or an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping. 18 Pa.C.S.A. § 2502(b), (d). The malice or

39

intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim. Commonwealth v. Lambert, 2002 PA Super 82, 795 A.2d 1010, 1021 (2002) (citing Commonwealth v. Mikell, 556 Pa. 509, 729 A.2d 566, 569 (1999)). The statute defining second degree murder does not require that a homicide be foreseeable; rather, it is only necessary that the accused engaged in conduct as a principal or an accomplice in the perpetration of a felony. Id. at 1023 (citing Commonwealth v. Laudenberger, 715 A.2d 1156, 1160 (Pa.Super.1998)).

In the case at bar, Brooks testified that Duran crouched over Thompson and shot him once in the head with the .38-caliber revolver while he and Defendant were engaged as principals in the commission of a robbery. Brooks further testified that Defendant brought down a woman from upstairs and that the three of them asked Thompson where he kept his drugs and money. Brooks testified that Thompson was shot by Duran after he and Defendant argued over who would be the one to shoot Thompson. Fahnbulleh testified that there were three men present in Thompson's house, including one who brought her downstairs, and that they continually asked Thompson where the drugs and money were. Collins testified that Thompson was killed in a manner consistent with someone crouching over him and shooting him once in the back of the head. Lay testified that the bullet specimen found underneath Thompson was from a .38-caliber firearm that had the same class characteristics as the .38-caliber revolver fired by Duran on April 29, 2010 at 2441 Brown Street. Bowie stated to the police that Defendant told him he had killed a man inside a house in Southwest Philadelphia during a home invasion robbery. Wakeel stated to the police that Brooks told him that he and two other men killed Thompson during a home invasion robbery in Southwest Philadelphia after they tried to steal marijuana from him. Thus the evidence presented at trial showed that Thompson was killed by Duran while Defendant was a

40

principal in the commission of a robbery. Therefore, the evidence was sufficient to find Defendant guilty of second-degree murder.

### 3. The evidence was sufficient to find Defendant guilty of robbery.

The evidence presented at trial was sufficient to find Defendant guilty of robbery. A person is guilty of robbery if, in the course of committing a theft, he inflicts serious bodily injury upon another or threatens another with or intentionally puts him in fear of immediate serious bodily injury. 18 Pa.C.S.A. § 3701(i)-(ii). The threat posed by the appearance of a firearm is calculated to inflict fear of deadly injury, not merely fear of serious bodily injury and the factfinder is entitled to infer that a victim was in mortal fear when a defendant visibly brandished a firearm. Commonwealth v. Hopkins, 2000 PA Super 47, 747 A.2d 910, 914-15 (2000) (citing Commonwealth v. Thomas, 376 Pa.Super. 455, 546 A.2d 116, 119 (1988)). A person is guilty of theft if he unlawfully takes movable property of another with the intent to deprive him thereof. 18 Pa.C.S.A. § 3921(a). An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission. 18 Pa.C.S.A. § 3701(2). Serious bodily injury is defined as a bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. 18 Pa.C.S.A. § 2301.

In the case at bar, Brooks testified that he, Defendant and Duran went to Thompson's house with the intent to steal drugs and money from Thompson and that, after Thompson answered his door, Defendant and Duran drew their firearms and ordered Thompson to lay on the ground. Brooks further testified that, while he and Defendant searched the house for the drugs and money, Duran hit Thompson on the head with his revolver and choked him before shooting him once in the head. Brooks testified that Defendant went upstairs and then searched

· 41

throughout the house for Thompson's marijuana. Bowie stated to the police that Defendant told him that he, Duran and another person entered Thompson's home with the intent to take marijuana from him and shot him. Thomas testified at trial and Wakeel stated to the police that Brooks had told each of them that he had planned to rob Thompson with Defendant and Duran and that Thompson was subsequently shot by Duran. Thus, the evidence was sufficient for the jury to find that Defendant placed Thompson in fear of deadly injury when he pointed the firearm he was carrying at him in the course of attempting to commit theft and was therefore guilty of robbery.

### 4. The evidence was sufficient to find Defendant guilty of conspiracy.

The evidence presented at trial was sufficient to find Defendant guilty of conspiracy. A conviction for conspiracy is sustained where the Commonwealth establishes that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy. Lambert, 795 A.2d at 1016 (citing Commonwealth v. Rios, 546 Pa. 271, 684 A.2d 1025, 1030 (1996)). In most cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by "the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators." Commonwealth v. Sanchez, 82 A.3d 943, 973 (Pa. 2013) (quoting Commonwealth v. Johnson, 604 Pa. 167, 985 A.2d 915, 920 (2009)). Four factors are to be utilized in deciding if a conspiracy existed. Those factors are: "(1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy." Commonwealth v. Nypaver, 2013 PA Super 144, 69 A.3d 708, 715 (2013) (quoting Commonwealth v. Feliciano, 67 A.3d 19, 25 (Pa.Super.2013)). The overt act

42

need not accomplish the crime-it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed. Commonwealth v. Weimer, 602 Pa. 33, 977 A.2d 1103, 1106 (2009).

In the case at bar, Brooks testified that, after Defendant told them that they should leave, he replied that they could not leave without killing Thompson as Thompson knew him and might retaliate. Brooks further testified that Defendant then told him that he would have to be the one to shoot Thompson and gave him the gun he had been carrying. Brooks testified that he refused to shoot Thompson, as he had never shot anyone before, and that, while he and Defendant were arguing over who would be the one to shoot Thompson, Duran shot Thompson once in the back of the head with the .38-caliber revolver. Thomas testified that Brooks told her that Defendant told him to kill Thompson and that, when he told Defendant that he could not kill Thompson, the other man in their group shot Thompson. Thus, the evidence showed that Defendant entered into an agreement with Brooks and Duran to kill Thompson after Brooks told them that they could not leave Thompson alive and that, while Defendant and Brooks argued over who would be the one to kill Thompson, Duran committed an overt act in furtherance of that agreement when he shot Thompson in the head. Therefore, the evidence presented at trial was sufficient to find Defendant guilty of criminal conspiracy.

### 5. The evidence was sufficient to find Defendant guilty of burglary.

The evidence presented at trial was sufficient to find Defendant guilty of burglary. A person is guilty of a burglary if he enters an occupied structure with the intent to commit a crime therein and without license or privilege to enter. Lambert, 795 A.2d at 1022. The intent to commit a crime after entry may be inferred from the circumstances surrounding the incident. Id. (citing Commonwealth v. Alston, 539 Pa. 202, 651 A.2d 1092, 1094 (1994)). Once one has

43

entered a private residence by criminal means, we can infer that the person intended a criminal purpose based upon the totality of the circumstances. Id. Under the burglary statute, a defendant commits first degree burglary if the location illegally entered: (1) is adapted for overnight accommodation but no individual is present; (2) is not adapted for overnight accommodation but an individual is present; or (3) is adapted for overnight accommodation and an individual is present. Commonwealth v. Waters, 2009 PA Super 257, 988 A.2d 681, 683(2009) (citing Commonwealth v. Ausberry, 891 A.2d 752, 756 (Pa.Super. 2006)).

In the case at bar, Brooks testified that he, Defendant and Duran went to Thompson's house with the intent to rob him of marijuana and money. Brooks further testified that, after Thompson answered the door, Defendant and Duran drew the firearms they were carrying and entered his property. Brooks further testified that Defendant went upstairs and brought a woman down before he searched Thompson's property for drugs and marijuana. Fahnbulleh testified that Thompson went downstairs to answer the doorbell and, a short time later, she saw two men come upstairs. Thomas testified that Brooks told her that he went with Defendant and one other man to Thompson's home and told Thompson that they wished to buy marijuana from him. Brooks further told her that, after Thompson let them into his home, the two men pulled out guns and robbed him. Bowie stated to the police that Defendant told him that he had killed an older man inside a house in Southwest Philadelphia during a home invasion robbery. Wakeel stated to the police that Brooks told him that he and his partners went to Thompson's house with the intent to rob him and that they drew their guns after Thompson answered the door. Thus, the evidence presented at trial was sufficient for the jury to conclude that Defendant entered an occupied structure which was adapted for overnight accommodation and in which an individual was present with the intent to commit a robbery therein. Therefore, the evidence was sufficient to

44

find Defendant guilty of burglary.

### 6. The evidence was sufficient to find Defendant guilty of Violation of the Uniform Firearms Act 6106.

The evidence presented at trial was sufficient to find Defendant guilty of carrying a firearm without a license (VUFA 6106). Any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license commits a felony of the third degree. 18 Pa.C.S.A. § 6106(a)(1). In order to convict a defendant for carrying a firearm without a license, the Commonwealth must prove: "(a) that the weapon was a firearm, (b) that the firearm was unlicensed, and (c) that where the firearm was concealed on or about the person, it was outside his home or place of business." Commonwealth v. Parker, 2004 PA Super 113, 847 A.2d 745, 750 (2004) (quoting Commonwealth v. Bavusa, 750 A.2d 855, 857 (Pa.Super. 2000)). To prove possession of a firearm, the Commonwealth must establish that an individual either had actual physical possession of the weapon or had the power of control over the weapon with the intention to exercise that control. In re R.N., 2008 PA Super 117, 951 A.2d 363, 369-70 (2008) (citing Commonwealth v. Carter, 304 Pa.Super. 142, 450 A.2d 142, 144 (1982)).

In the case at bar, Brooks testified that he, Defendant and Duran walked from Defendant's house to Thompson's house and that, after Thompson answered his door, Defendant drew a .45-caliber black semiautomatic firearm that he had been carrying. The parties stipulated that Defendant did not have a valid license to carry a firearm in Philadelphia and the Commonwealth moved a certificate of non-licensure into evidence which showed that Defendant did not possess a valid license to carry a firearm nor a valid sportsman permit in Pennsylvania on November 8, 2009. Thus, the evidence was sufficient for the jury to conclude that Defendant possessed a firearm concealed on his person outside of his home or place of business and that he

45

did not have a valid license to carry a firearm. Therefore, the evidence was sufficient to find Defendant guilty of VUFA 6106.

## VIII. THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE.

The verdict was not against the weight of the evidence presented at trial. Under Pennsylvania law, a weight of the evidence claim concedes that the evidence was sufficient to sustain the verdict. Commonwealth v. Lyons, 622 Pa. 91, 79 A.3d 1053, 1067 (2013) (citing Commonwealth v. Widmer, 560 Pa. 308, 744 A.2d 745, 751-52 (2000)). The weight of the evidence is "exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." Commonwealth v. Luster, 2013 PA Super 204, 71 A.3d 1029, 1049 (2013) (quoting Commonwealth v. Champney, 574 Pa. 435, 832 A.2d 403, 408 (2003)). In addition, "where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence...rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." Commonwealth v. Collins, 2013 PA Super 158, 70 A.3d 1245, 1251 (2013) (quoting Champney, 832 A.2d at 408). A verdict is not contrary to the weight of the evidence because of a conflict in testimony or because the reviewing court on the same facts might have arrived at a different conclusion than the fact-finder. Commonwealth v. Morales, 91 A.3d 80, 91 (Pa. 2014) (quoting Commonwealth v. Tharp, 574 Pa. 202, 830 A.2d 519, 528 (2003)). Rather, a new trial is warranted only when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. Id.

In the case at bar, the verdict was not against the weight of the evidence presented at trial. To the contrary, there was substantial credible and consistent evidence which implicated

46

Defendant in Thompson's murder. Brooks testified at trial that he, Defendant, and Duran planned to rob Thompson of marijuana and money. Brooks further testified that the three of them went to Thompson's house, knocked on his door and, after Thompson answered, Defendant and Duran drew the firearms they had been carrying, a .38-caliber revolver and a .45-caliber semiautomatic, and told Thompson to lie on the floor. Brooks testified that he and Defendant searched the house, but were unable to find any marijuana and Defendant told them they should go. Brooks further testified that he told them that they could not leave Thompson alive, as he was afraid of retaliation, and Defendant then told him that he would have to be the one to shoot Thompson. After Brooks refused to shoot Thompson and the two of them argued, Duran shot Thompson once in the head using the .38-caliber revolver. Thomas testified that Brooks told her that he went with Defendant and one other man to Thompson's house to rob him of marijuana and that the other man shot Thompson after Defendant told Brooks that he would have to be the one to kill Thompson. Baker testified that on November 9, 2008, the day after Thompson's murder, three males, one of whom was carrying a .38-caliber revolver, came to his house and robbed him of his two .40-caliber firearms. Bowie stated to the police that Defendant and Duran told him that they had killed a man in Southwest Philadelphia during a home-invasion robbery. Bowie further stated to the police that Duran told him that he sold the .38-caliber revolver to a person named Diddy. Hines stated to the police that he received the .38-caliber revolver he was arrested for carrying from Diddy and that Duran told him that he had killed a man inside a house in Southwest Philadelphia near Defendant's house. Wakeel stated to the police that Brooks told him that he and two other men had shot Thompson inside his house in Southwest Philadelphia during a home-invasion robbery and that they had used the .38-caliber revolver to kill him. DeMalto testified that the serial number on the Heckler & Koch .40-caliber recovered from Duran when

47

he was arrested matched the serial number of the Heckler & Koch .40-caliber handgun that was stolen from Baker while the firearm recovered from Bowie on June 9, 2010 had the same serial number as the Glock that was taken from Baker. Lay testified that the .38-caliber revolver recovered by Hines matched a bullet fired by Duran at 2441 Brown Street and had the same class characteristics as the bullet found underneath Thompson's head at the crime scene. Thus, there was overwhelming credible and consistent evidence that Defendant actively participated in the home-invasion that resulted in Thompson's death, including Defendant's own admission to his friend, Bowie, the testimony of Defendant's accomplice, Brooks, and Defendant and Duran's use of the same firearms to rob Baker the morning after the murder. Consequently, it cannot be said that the jury's verdict was so contrary to the evidence that it shocked one's sense of justice. Therefore, the verdict was not against the weight of the evidence.

## CONCLUSION

After a review of the applicable rules of evidence, statutes, case law and testimony, this Court committed no error. This Court did not err when it denied Defendant's motion to dismiss the information based on delay. This Court did not err when it denied Defendant's motion to suppress identification. This Court did not err when it denied Defendant's motion to exclude prior bad acts evidence and granted the Commonwealth's motion to admit prior bad acts evidence. This Court did not err when it limited Defendant's cross-examination of a witness on the potential prison sentence he was facing. This Court did not err when it instructed the jury that the prior statements of certain witnesses could be considered as substantive evidence. This Court did not err in giving a flight instruction. The evidence was sufficient to find Defendant guilty of all charges. The verdict was not against the weight of the evidence. Therefore, this Court's judgment of sentence should be upheld on appeal.

BY THE COURT:

_Denese Brinkley_ J.

49